# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-00209-SCT

*YASMINE HUGHES a/k/a YASMIN HUGHES*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 12/07/2006 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | WINSTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES T. McCAFFERTY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/27/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., CARLSON AND LAMAR, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     On November 27, 2006, Yasmin Hughes was tried and convicted in the Circuit Court of Winston County on one count of armed robbery, for which he was sentenced to serve thirty years, and two counts of aggravated assault, for which he was sentenced to serve twenty years each, with the sentences to run concurrently. We affirm.

## FACTS

¶2.     On the evening of May 2, 2006, Jack "Bubba" Warner, Jr. (Warner), his wife Pat, and his seventeen-year-old son Cody were at their home in Louisville, Mississippi. Around 10:00

p.m., Warner heard a knock at their carport door. Warner opened the door to find two young males, each dressed in black sweatshirts and pants. These young men were later identified as Adrion Webster and Yasmin Hughes.

¶3.     Webster, who was standing closest to the door, said that he and Hughes had run out of gas and asked to use Warner's phone. Warner stepped back into the house, grabbed his cordless phone, and handed the phone to Webster. Webster made a phone call and told the person that he had run out of gas.[1] Warner then asked Webster how far down the road they were and specifically asked if they were past the bridge.[2] Webster responded that they were down around the bridge.

¶4.     In fact, Webster and Hughes had not run out of gas[3] and their vehicle was not around either a bridge or culvert. Rather, they had parked their truck down a small dirt road, approximately 150 to 200 yards from Warner's home.

¶5.     As Webster returned the phone to Warner, Hughes, who was standing in the back, pulled a hood over his head.[4] Feeling that something was about to go wrong, Warner offered

---

[1] Phone records later showed that Webster called the residence of Talmadge Edwards at 10:07 p.m. Hughes was staying at Edwards's home at the time.

[2] The bridge previously located near Warner's home had been replaced with a culvert.

[3] The trial judge noted that Webster's story about being out of gas was "obviously" untrue because he and Hughes fled in the vehicle. In his statement to the police, Hughes confirmed that Webster took him home after they returned to the truck. The home at which Hughes was staying at the time was located about 11.3 to 12.3 miles from the Warners' residence.

[4] Hughes could not remember whether he had his hood up or down.

2

the two men a gallon or two of gas that he kept under his carport. Webster refused the offer and said "[t]hey are bringing us some gas."

¶6.     When Warner turned to go back into the house, Webster shot Warner three times. Warner's wife, Pat, heard the gunshots and ran to the carport door. Pat was shot at twice, one bullet hitting her in the leg and the other hitting the door frame. Seeing that his wife had been shot, Warner ran toward Webster. Warner was then shot in the groin. Webster and Hughes ran out of the carport and toward the back of Warner's home. Pat was taken to the Louisville hospital and later released, while Warner was transported to the University of Mississippi Medical Center in Jackson.

¶7.     The ensuing investigation showed that Webster's phone call had gone to an answering machine at the home of Talmadge Edwards, Hughes's uncle with whom Hughes was staying at the time. On May 5, 2006, Officer Greg Clark of the Louisville Police Department and Agent Clay Bain with the Mississippi Bureau of Investigation interviewed Hughes. Hughes waived his rights and gave a statement. Initially, Hughes denied any involvement in the crime and said he had spent the evening in question around Edwards's home. However, Hughes gave a second, signed statement in which he stated the following:

> [Webster] picked me up from my house and we went riding around town. We got into a conversation about money and ways to make money. We were talking about huslting [sic], robbing and even right ways to make money.[5] [Webster] asked to use my phone and I told him I didnt [sic] have it. [Webster] pulled over and told me to walk up to someone [sic] house with him so he could use the phone. A man answer [sic] the door and let [Webster] use the phone. When [Webster] gave the phone back I turned away and started walking toward the truck when I heard gun shots. I ran and didnt [sic] look

---

[5]     As part of their conversation regarding "ways to make money," Hughes and Webster mentioned barber school, as well.

3

back. When we got back to the car he was asking me why did I run and then said forget it lets [sic] just get away before the police come. After that he took me home.

Hughes also told Officer Clark that after he and Webster returned to the truck, Webster looked at him and said, "Why did you run? That was our lick."[6]

¶8. On September 26, 2006, Hughes was indicted on one count of armed robbery and two counts of aggravated assault.[7] On November 27, 2006, Hughes was tried and convicted on all three counts. Hughes was sentenced to thirty years on the armed robbery charge and twenty years each on the aggravated assault charges, with the sentences to be served concurrently.

¶9. On appeal, Hughes raises the following assignments of error: (I) whether Hughes's conviction was based on insufficient evidence or was contrary to the overwhelming weight of the evidence; (II) whether the jury was required to accept a reasonable hypothesis consistent with Hughes's innocence; (III) whether the state proved the elements of armed robbery; (IV) whether the trial court erred in giving a supplemental instruction to the jury; (V) whether prosecutorial misconduct requires reversal; and (VI) whether Hughes's conviction should be reversed due to other errors or cumulative error.

## DISCUSSION

I. **Whether Hughes's conviction was based on insufficient evidence or was contrary to the overwhelming weight of the evidence.**

A. **Sufficiency of the evidence.**

---

[6] A "lick" typically means to rob somebody or to steal something.

[7] Webster was also indicted, but pleaded guilty to two counts of aggravated assault, and the armed robbery charge was dropped.

4

¶10. When reviewing a challenge to the sufficiency of the evidence, this Court will reverse and render only if the facts and inferences "'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' . . . ." *Brown v. State*, 965 So. 2d 1023, 1030 (Miss. 2007) (quoting *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005)). The evidence will be deemed sufficient if "'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,'. . . ." *Brown*, 965 So. 2d at 1030 (quoting *Bush*, 895 So. 2d at 843). The relevant question is whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Brown*, 965 So. 2d at 1030 (quoting *Bush*, 895 So. 2d at 843).

¶11. This Court considers the evidence in the light most favorable to the state. *Bush*, 895 So. 2d at 843. The state receives the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Wilson v. State*, 936 So. 2d 357, 363 (Miss. 2006) (citing *Hawthorne v. State*, 835 So. 2d 14, 22 (Miss. 2003)).

¶12. Hughes argues that there was insufficient evidence to prove that he aided and abetted the crimes of armed robbery or aggravated assault. Hughes submits that there is no evidence to show that he had prior knowledge of Webster's criminal intent, that he participated in the crimes in any way, or that he otherwise aided and abetted the commission of the crimes. Hughes asserts that he was merely present at the scene and never communicated an intent to aid or encourage Webster's actions.

¶13. Hughes points to the testimony of Officer Greg Clark, who stated that there was no evidence of any plan to rob the Warners, or that Hughes knew about Webster's gun. Hughes also contends that Webster's statement, "Why did you run? That was our lick," occurred after the fact and provides no evidence that Hughes knew beforehand that Webster had a gun or was going to assault anyone.

¶14. One who aids and abets another in the commission of a crime is guilty as a principal. *Rubenstein v. State*, 941 So. 2d 735, 773 n.18 (Miss. 2006) (quoting *King v. State*, 857 So. 2d 702, 739 (Miss. 2003)). To aid and abet the commission of a felony, one must "'do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime . . . . [or] participate[] in the design of the felony.'" *Vaughn v. State*, 712 So. 2d 721, 724 (Miss. 1998) (quoting *Malone v. State*, 486 So. 2d 360, 363-64 (Miss. 1986)). Criminal law does not recognize guilt by association. *Davis v. State*, 586 So. 2d 817, 821 (Miss. 1991) (citing *Pryor v. State*, 239 So. 2d 911, 912 (Miss. 1970)). Mere presence, even with the intent of assisting in the crime, is insufficient "unless the intention to assist was in some way communicated to [the principal]." *Crawford v. State*, 133 Miss. 147, 151 (1923). Furthermore, "[p]roof that one has stood by at the commission of a crime without taking any steps to prevent it does not alone indicate such participation or combination in the wrong done as to show criminal liability, although he approve of the act." *Harper v. State*, 83 Miss. 402, 415, 35 So. 572, 573 (1903) (quoting *McClain on Criminal Law*, ch. 15, sec. 194).

¶15. Hughes discusses primarily two cases in support of his argument. In *U.S. v. James*, 528 F.2d 999 (5th Cir. 1976), FBI agents and members of the Jackson police force engaged in a shoot-out with members of the Republic of New Africa [RNA], leaving one Jackson

police officer dead and wounding another officer and an FBI agent. *James*, 528 F.2d at 1004. The Fifth Circuit reversed the conviction of Ann Lockhart, the wife of the RNA's vice-president, finding that there was insufficient evidence "to show that she had any knowledge of the conspiracy or participation in it." *Id*. at 1013. Lockhart was a resident of Wisconsin and had planned only a brief stay at the RNA headquarters in Jackson, Mississippi. *Id*. Even though Lockhart had purchased groceries and prepared meals for RNA members, the Fifth Circuit stated that "[m]ere presence at the scene of a crime or mere association with the members of a conspiracy is not enough to prove participation in it." *Id*.

¶16. In *Cochran v. State*, 191 Miss. 273, 2 So. 2d 822 (1941), Cochran was arrested for possession of beer and slot machines inside a dance hall. *Cochran*, 2 So. 2d at 822. This Court held that the arrest was unauthorized because Cochran was not an employee of the dance hall, but was merely "staying" in the area. *Id*. at 823. This Court explained that "some degree of participation in the criminal act must be shown in order to establish any criminal liability." *Id*. (quoting *Harper*, 83 Miss. at 415, 35 So. at 573).

¶17. We find the subject case distinguishable from both *James* and *Cochran* because there is sufficient evidence of Hughes's participation in the crime. Webster and Hughes had been riding around talking about ways to make money, which included "robbing." After parking their truck on a small dirt road late at night, Hughes accompanied Webster some 150 to 200 yards to the Warners' home.

¶18. Hughes contends that after Webster returned the phone to Warner, he walked off, believing that Webster "had finished his business." In a written statement made later that night, Warner said that Hughes pulled a hood over his head and walked off before any

7

shooting occurred. However, Warner explained at trial that it looked as if both men had turned to walk away. Considering the evidence in the light most favorable to the state, and giving the state the benefit of all reasonable inferences, we find that Hughes knew what was about to transpire and acted, along with Webster, as if he were walking away.

¶19.  Hughes communicated his intent to assist Webster in the commission of the crimes by accompanying Webster some 150 to 200 yards to Warner's home, and acting, along with Webster, as if he were leaving just before Webster began shooting.

¶20.  Finally, after Webster and Hughes returned to their truck, Webster asked Hughes, "Why did you run? That was our lick." While this statement was made after the shootings had occurred, a juror could reasonably infer that a "lick" or robbery had been their mutual intent beforehand.

¶21.  Therefore, we find that a rational juror could have found beyond a reasonable doubt that Hughes aided and abetted the crimes of armed robbery and aggravated assault.

### B.  Weight of the evidence.

¶22.  When reviewing a challenge to the weight of the evidence, this Court will overturn a jury verdict "only when it is so contrary to the evidence presented that to let it stand would sanction an unconscionable injustice." *Wilson*, 936 So. 2d at 363 (citing *Bush*, 895 So. 2d at 845).  A new trial should be granted on the basis of the weight of the evidence "only in exceptional circumstances, when the evidence weighs heavily against the jury's verdict." *Wilson*, 936 So. 2d at 363 (citing *Bush*, 895 So. 2d at 845).

¶23.  This Court considers the evidence in the light most favorable to the verdict. *Bush*, 895 So. 2d at 844 (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)).  The state

8

receives the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Wilson*, 936 So. 2d at 363 (citing *Hawthorne*, 835 So. 2d at 22).

¶24. Based upon the facts previously discussed, we find that Hughes's guilty verdict is not so contrary to the evidence as to constitute an "unconscionable injustice." Furthermore, the evidence does not weigh heavily against the jury's verdict. Accordingly, we find that Hughes's conviction was not against the overwhelming weight of the evidence.

## II. Whether the jury was required to accept a reasonable hypothesis consistent with Hughes's innocence.

¶25. Hughes submits that there remains a reasonable hypothesis that he did not commit the crimes, and that the jury was required to accept a reasonable hypothesis consistent with his innocence.

¶26. A jury is instructed to exclude every other reasonable hypothesis than that of guilt when a case is based entirely upon circumstantial evidence. *Jones v. State*, 797 So. 2d 922, 927 (Miss. 2001) (citing *Henderson v. State*, 453 So. 2d 708, 710 (Miss. 1984)). A circumstantial evidence instruction is required "only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant." *Rubenstein*, 941 So. 2d at 785 (quoting *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991)). In the subject case, the state produced both an eyewitness, Warner, as well as an admission[8] by Hughes. Therefore, we find this issue to be without merit.

_____

[8] "An admission is a statement by the accused, direct or implied, of facts pertinent to the issue, and tending, in connection with other facts, to prove his guilt." *Reed v. State*, 229 Miss. 440, 446, 91 So. 2d 269, 272 (1956) (citing *Pringle v. State*, 108 Miss. 802, 67 So. 455 (1914)). An admission constitutes direct evidence of a crime so that a circumstantial evidence instruction is not required. *Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985).

**III.  Whether the state proved the elements of armed robbery.**

¶27.   Hughes argues that his armed-robbery conviction cannot stand because there was no taking or attempted taking of any property as required under the armed-robbery statute.[9] Hughes is correct that nothing was ever taken or demanded from the Warners prior to or after the shootings.

¶28.   Mississippi Code Annotated Section 97-3-79, states, in pertinent part, that:

> Every person who shall feloniously *take or attempt to take* from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . .

Miss. Code Ann. § 97-3-79 (Rev. 2006) (Emphasis added).  An attempt to commit a crime consists of three elements: "(1) an intent to commit a particular crime; (2) a direct ineffectual act done toward its commission; and (3) the failure to consummate its commission." *Spann v. State*, 771 So. 2d 883, 891 (Miss. 2000) (citing *Greenwood v. State*, 744 So. 2d 767, 769 (Miss. 1999)).

**A.    Intent to rob.**

¶29.   Intent to rob can be shown from the facts surrounding the crime. *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005) (citing *Lynch v. State*, 877 So. 2d 1254, 1266 (Miss. 2004)). Intent to commit a crime is a question of fact to be determined by a jury based on the facts presented in the case. *Walker*, 913 So. 2d at 224 (quoting *Knox v. State*, 805 So. 2d 527, 531 (Miss. 2002)).

---

[9] Notably, the armed robbery charge against Webster was dropped after he pleaded guilty to two counts of aggravated assault.

10

¶30. We find that intent to rob can be inferred from the facts of this case. Hughes and Webster had been riding around discussing ways to make money, which included the subject of robbing. Late at night, Webster and Hughes parked their vehicle on a small dirt road and walked about 150 to 200 yards to the Warners' home. Webster told Warner a false story about being out of gas. Upon returning to their truck, Webster asked Hughes, "Why did you run? That was our lick."

¶31. Intent to rob also can be inferred from the suspicious activity witnessed by a neighbor just before the crimes occurred. Barbara Warner, who lived two houses down from the Warners, testified that shortly before 10:00 p.m. on May 2, 2006, a red "old style boxy, short wheel base truck" pulled into her driveway and sat for about two or three minutes. The vehicle described by Barbara is consistent with the vehicle driven by Webster on the night in question. Barbara's home was well lit outside with five "large night lights" and she had three dogs in her yard. Barbara could see the heads of two people in the truck. After sitting in her driveway a short time, the truck pulled out of Barbara's driveway and headed towards the Warners' home.

**B.  Overt act.**

¶32. An overt act is one that "will apparently result, in the usual and natural course of events if not hindered by extraneous causes, in the commission of the crime itself, and an act apparently adapted to produce the intended result is sufficient to constitute the overt act essential to an attempt." *Greenwood*, 744 So. 2d at 769 (citing *Bucklew v. State*, 206 So. 2d 200, 202 (Miss. 1968)).

11

¶33. We find that assault with a deadly weapon was the act chosen to carry out the robbery. In the normal course of events—Warner was incapacitated and/or Hughes did not run—a robbery would have resulted.

### C. Failure to consummate the crime.

¶34. Property need not be taken for a robbery to occur. *Spann*, 771 So. 2d at 891-92. In *Greenwood*, this Court affirmed a robbery conviction even though nothing was ever taken or demanded. *Greenwood*, 744 So. 2d at 769-70. Greenwood told a co-indictee that he planned to rob a certain person and said that he planned to knock on this person's door and point a gun to the person's head. *Id*. at 770. Yet Greenwood failed to carry out his initial plan and asked for gas instead. *Id*. After the victim assumed that Greenwood and his companions had left, shots were fired and a concrete block was thrown through the victim's plate-glass, sliding door. *Id*. at 769. However, Greenwood and his cohorts fled when the victim retrieved his hunting rifle and returned gunfire. *Id*. This Court held that the jury was free to infer that the only reason no robbery was consummated was because the intended victim had returned gunfire. *Id*. at 770.

¶35. Hughes cites *Anderson v. State*, 168 Miss. 424, 151 So. 558 (1934) for support. In *Anderson*, two men went to the back door of a store and asked for a pack of cigarettes. *Anderson*, 151 So. at 558. After one of the store's owners returned with the cigarettes, the defendants proceeded to shoot all three men who were at the store. *Id*. at 559. After the shootings, both defendants simply left. *Id*. This Court held that the evidence was insufficient to support "felonious intent to take personal property." *Id*. To infer any further intent would have been "the merest speculation." *Id*.

12

¶36. We find *Anderson* distinguishable because felonious intent is not merely speculative in this case. A juror reasonably could infer that Webster and Hughes intended to rob the Warners, but abandoned their plan when Warner did not go down after being shot multiple times.

¶37. For the aforementioned reasons, we find that the state proved the essential elements of armed robbery.

**IV.    Whether the trial court erred in giving a supplemental instruction to the jury.**

¶38. Approximately thirty minutes into jury deliberations, the jury sent the trial judge a written note which asked, "Is Yasmin being charged with armed or attempted robbery?" The trial judge initially said that he would tell the jury that they would simply have to refer to the instructions already given to them. Hughes raised no objection and simply asked that no single instruction be singled out. The state, however, saw no harm in the trial court referring the jury to Jury Instruction No. 2, which contained the elements of the crimes charged. The trial judge expressed reservations about referring to any specific jury instruction out of concern for reversible error on appeal.

¶39. After further discussion between counsel for both parties and the trial judge, the trial judge proposed the following response: "You must consider all the instructions I have given you. The elements of the offense are defined in Instruction S-2." Both parties indicated their satisfaction with the trial judge's response. Yet, as the trial judge read his response aloud a second time, Hughes's counsel noticed the explicit reference to Instruction S-2 and objected. Hughes's counsel submitted that a proper response would be "[t]he elements of the crimes charged are contained in the instructions."

13

¶40. Over Hughes's objection, the trial judge gave his proposed response, which referred the jury to Instruction S-2. The trial judge explained: ". . . I don't think that [the proposed response] singles out any instruction to the prejudice of the Defendant in light of the fact that the only other two instructions we have are an accessory instruction and the failure to testify instruction." The response which the jury received stated: "You must consider all of the instructions the Court has given to you. The elements of the crimes charged are contained in Instruction # 2."

¶41. A trial court has authority to give supplemental instructions to a jury and the decision to do so is reviewed under an abuse-of-discretion standard. *Mickell v. State*, 735 So. 2d 1031, 1033 (Miss. 1999); *see also Payton v. State*, 897 So. 2d 921, 956 (Miss. 2003) (citing Uniform Rules of Circuit and County Court Practice Rule 3.10); *Wright v. State*, 512 So. 2d 679, 681 (Miss. 1987) (the law does not require a trial judge to become mute once the jury retires, particularly when the jury appears to be at a loss as to how to proceed).

¶42. Once the trial court receives a question from the jury, the judge's first responsibility is to determine whether any further instruction is necessary. *Payton*, 897 So. 2d at 955 (quoting *Girton v. State*, 446 So. 2d 570, 572 (Miss. 1984)). No further instruction should be given unless necessary "for clarity or to cover an omission." *Payton*, 897 So. 2d at 955 (quoting *Girton*, 446 So. 2d at 572). The trial judge must then be certain that he understands precisely what is meant by the jury's inquiry. *Girton*, 446 So. 2d at 573.

¶43. This Court is "particularly sensitive to the danger that a supplemental instruction might cause a jury to single out and focus upon the point there presented and give it undue importance." *Wright*, 512 So. 2d at 681. Whether a single instruction has been singled out

14

through supplemental instructions often turns on the manner in which the instruction is presented. *Shaw v. State*, 540 So. 2d 26, 30 (Miss. 1989). There is reversible error when the repetition "gives such undue prominence to some principle or phase of the case as is calculated to impress it unduly on the jurors' minds, or results in an unfair statement of law in relation to accused's rights." *Haynes v. State*, 451 So. 2d 227, 231 (Miss. 1984) (quoting 23A C.J.S., Criminal Law, No. 1304).

¶44. Hughes argues that the trial judge impermissibly called attention to a specific instruction and failed to ascertain exactly what the jury was asking. Hughes asserts that by emphasizing the "elements of the crime" in Jury Instruction No. 2, the trial judge drew attention from Jury Instructions No. 3 and No. 4.

¶45. Jury Instruction No. 2 set forth the elements of the crimes of armed robbery and aggravated assault. Jury Instruction No. 3 stated that Hughes may be held responsible for the acts and conduct of other persons if he deliberately and voluntarily participated in the commission of the crimes. Jury Instruction No. 3 further explained that the state must prove beyond a reasonable doubt that every element of the offense had been committed by some person and that Hughes voluntarily participated in the crime. Jury Instruction No. 4 stated that the state has the burden of proof beyond a reasonable doubt and that the jury must not hold anything against Hughes based on the fact that he did not testify.

¶46. Hughes analogizes this case to *Haynes*, in which this Court held the supplemental instruction to be error. *Haynes*, 451 So. 2d at 231. Yet, in *Haynes*, the trial judge responded to the jury's question by not only calling the jury's attention to two specific instructions, but inviting their attention to a specific portion of one of the instructions. *Id*. at 229-30.

15

Additionally, the supplemental instruction in *Haynes* likely had accentuated an already erroneous instruction. *Id*. at 231.

¶47.   We find that the jury's question required no additional inquiry from the trial judge. Furthermore, the trial judge's supplemental instruction did not place undue prominence on any one principle or phase of the case so as to cause prejudice to Hughes. Jury Instruction No. 2 contained the elements of *all* the crimes for which Hughes was charged. Additionally, the trial judge instructed the jury to consider all the instructions given to them. *See Wright*, 512 So. 2d at 681 (the problem normally associated with supplemental jury instructions was adequately addressed by additional language instructing the jury to consider the supplemental instruction along with their other instructions).

¶48.   Accordingly, we find that the trial judge did not abuse his discretion in giving the supplemental instruction.

## V.     Whether prosecutorial misconduct requires reversal.

¶49.   Generally, the failure to object to the prosecution's statements during closing arguments operates as a procedural bar. *Ross v. State*, 954 So. 2d 968, 1001 (Miss. 2007) (citing *Spicer v. State*, 921 So. 2d 292, 309 (Miss. 2006)). Because Hughes failed to object to the prosecution's statements during closing arguments, this issue is procedurally barred on appeal.

¶50.   Procedural bar notwithstanding, the prosecution's reference to other local armed robberies which involved a similar pattern of behavior was for illustrative purposes, and was not intended to incite the passions and prejudices of the jury. *See Brewer v. State*, 704 So.

16

2d 70, 71-73 (Miss. 1997).  The prosecution also repeatedly used the word "they" because the state's theory of the case was that Hughes and Webster acted in concert.

¶51.    Hughes argues further that the prosecution violated his constitutional due-process rights by misrepresenting Hughes as the shooter.  The alleged misrepresentation is set out below:

> Why did [Hughes] hide his head?  He was hoping that [the Warners] couldn't identify them.  He was hoping [the Warners] wouldn't know who did it.  If [the Warners] didn't get killed, they wouldn't be able to identify [Hughes and Webster], and luckily, [the Warners] didn't get killed.  *Of course, when you are shooting somebody four times, what are you intending?*

We do not find that this statement was intended to implicate Hughes as the gunman.  The context of the prosecutor's argument is that Hughes knew that serious bodily injury was intended, and therefore, he tried to conceal his identity.

¶52.    Finally, Hughes argues that the prosecutor misrepresented Hughes's statement about his and Webster's conversation earlier that night.  The prosecutor asserted that Hughes admitted "right before we went there, one of the things we were talking about was robbing somebody."  Hughes contends that robbery was a general topic of his and Webster's broader conversation and that they never talked about robbing anyone in particular.  We find that if robbery was being discussed as a way to make money, a reasonable inference can be made that some person or entity was to be targeted.

¶53.    The trial judge instructed the jury that arguments, statements, and remarks of counsel are not evidence.  When a jury is instructed that comments made by counsel are not evidence, reversal is not required.  ***Burns v. State***, 729 So. 2d 203, 229 (Miss. 1998) (citing ***Ormond***

17

*v. State*, 599 So. 2d 951, 961 (Miss. 1992)).  For all the reasons discussed above, we find no prosecutorial misconduct to require reversal.

**IV.    Hughes's sentence is unconstitutional because it punished Hughes for exercising his right to trial and was disproportionate to his role in the crime.**

¶54.    Errors related to improper sentencing are procedurally barred if no objection is made at trial.  *Hobgood v. State*, 926 So. 2d 847, 857 (Miss. 2006) (citing *Cox v. State*, 793 So. 2d 591, 599 (Miss. 2001)).  Because no objection was raised at trial, this issue is procedurally barred on appeal.

¶55.    Procedural bar notwithstanding, this Court will not ordinarily review a sentence if it is within the statutory limits.[10]  *Hersick v. State*, 904 So. 2d 116, 128 (Miss. 2004) (quoting *King v. State*, 857 So. 2d 702, 731 (Miss. 2003)); *Johnson v. State*, 666 So. 2d 784, 797 (Miss. 1995); *Reynolds v. State*, 585 So. 2d 753, 756 (Miss. 1991).  However, a trial court may not impose a heavier sentence because the defendant exercised his right to a trial by jury than that which the defendant was offered in the plea bargaining process.  *Johnson*, 666 So. 2d at 797 (citing *Temple v. State*, 498 So. 2d 379, 381 (Miss. 1986)).  A sentence must be based only on legitimate factors.  *Id*. (citing *Fermo v. State*, 370 So. 2d 930, 932-33 (Miss. 1979)).

---

[10]    Armed robbery carries a maximum penalty of life under Mississippi Code Annotated Section 97-3-79 (Rev. 2006).  Aggravated assault carries a maximum penalty of one year in the county jail or twenty years in the state penitentiary under Mississippi Code Annotated Section 97-3-7(2)(b) (Rev. 2006).  Thus, Hughes's sentence of thirty years on the armed robbery charge, and twenty years each on the aggravated assault charges, are within the statutory limitations.

18

¶56.   Hughes claims that his sentence unconstitutionally punished him for exercising his right to trial.  Hughes points to the following comments made by the trial judge during the sentencing phase of the trial:

> There has been another request for leniency, of mercy in this case.  You know, when you are offered leniency and mercy, sometimes you have got to pick it up.  And Mr. Hughes was offered a sentence of ten years on aggravated assault, which would have been with the possibility of parole.  The most he would have had to serve would have probably been 85 percent of that.  That is eight and a half years, and after discussions with his father and everybody, the other people involved in this thing, he decided he didn't want that.  He wanted to take his chances and go to trial.  And of course, when he did, the jury found that he was just as culpable as Mr. Webster.  And by doing that, by taking that gamble, he, unlike Mr. Webster, is now convicted of three charges.

> Well, not only did he get that offer of leniency, he got one extended one to him that he didn't even ask for.  The state and the victims in this case agreed for this matter to not go to the jury on sentencing on the armed robbery and left it up to me.  Again, had it gone to that jury, my observation is that he would have been, they would have sentenced him to life without parole.  And so he is not going to get that, and so he has received leniency on two occasions, one of which he picked up and one he didn't ask for and got.  So it's a bad situation for everybody involved in this.

> But one of the things people in this country are entitled to, they are entitled to be at their house and be left alone.  They are entitled to folks not to come to their house in the middle of the night and shoot them and rob them, and when people do that to other people, then they have to get what they deserve.

> Mr. Hughes, you weren't the shooter.  I'm going to give you some, some slight benefit for that but not much.  The jury found that you should get as much as the other, as Mr. Webster.

> Therefore, on the armed robbery, I sentence you to thirty (30) years with the Mississippi Department of Corrections.  On the two aggravated assault charges, I sentence you to twenty (20) years each and order that those sentences run concurrent with the armed robbery charge.

¶57. We find that Hughes was not given a heavier sentence because he exercised his right to trial. The trial judge's comments pertaining to Hughes's plea negotiations are best described as the trial court's disposition of Hughes's post-conviction request for leniency. In sentencing Hughes, the trial judge's concern was the nature of the offense and Hughes's role in the crime. Additionally, there is no indication in the record that the trial judge was made aware of Hughes's former plea negotiations until the sentencing phase of the trial. *See Edwards v. State*, 800 So. 2d 454, 471 (Miss. 2001) (no error in imposing a greater sentence than that offered in the plea bargaining process where the trial judge remained aloof or unaware of former plea negotiations until the sentencing phase of the trial).

¶58. Furthermore, an aider and abetter is considered to be as guilty as the actual perpetrator. *Rubenstein*, 941 So. 2d at 773 n.18 (citing *King*, 857 So. 2d at 739). In light of the violent nature of these crimes, we find no support for an inference of gross disproportionality, particularly considering that armed robbery carries a potential life sentence. *Mingo v. State*, 944 So. 2d 18, 34 (Miss. 2006) (citing *Nichols v. State*, 826 So.2d 1288, 1290 (Miss. 2002) (This Court employs the Eighth Amendment proportionality analysis "only when a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality.'").

V.      **Whether Hughes's conviction should be reversed due to other errors or cumulative error.**

        A.      **Jury Instruction No. 3.**

20

¶59. Hughes argues that Jury Instruction No. 3 was incomplete and likely confused the jury because it failed to inform the jury that intent to aid must be communicated to the principal in order for aider and abetter to be found guilty.

¶60. Because Hughes failed to raise an objection to Instruction No. 3, this issue is procedurally barred. *See **Rubenstein v. State***, 941 So. 2d 735, 793 (Miss. 2006) (citing ***Williams v. State***, 684 So. 2d 1179, 1203 (Miss. 1996)). Procedural bar notwithstanding, the gravamen of Hughes's issue with Instruction No. 3 is that the jury believed mere presence was enough. However, Jury Instruction No. 3 expressly stated that neither mere presence nor knowledge that a crime was being committed was sufficient to establish that Hughes aided and abetted the crimes. Accordingly, this issue is without merit.

### B. Failure to grant Hughes's motion to quash the venire.

¶61. Hughes argues that the trial court erred in failing to grant his motion to quash the venire based on the fact that both the Warners and the shootings were well known within the community of Winston County.

¶62. Thirty-five of the fifty panel members had heard something about the case, three of whom admitted being impacted by what they had heard. Twelve of the fifty actually knew the Warners. In overruling Hughes's motion to quash, the trial judge stated:

> . . . [O]ut of all those excused for cause, there are only about three of them were [sic] affected at all by what was stated in the community, and after extensive voir dire, the people that had a relationship with the Warners or knew people in this case said that they could listen to the evidence and be fair and impartial in this case and that they did, all acknowledged that they would not even feel embarrassed or have to explain their decision to anybody after consideration of the case.

21

¶63.   The decision to quash the venire rests in the sound discretion of the trial court. *Kolberg v. State*, 829 So. 2d 29, 83 (Miss. 2002) (citing *Evans v. State*, 725 So. 2d 613, 649 (Miss. 1997)).  "The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen."  *Howell v. State*, 860 So. 2d 704, 720 (Miss. 2003) (quoting *Simon v. State*, 688 So. 2d 791, 803 (Miss. 1997)).

¶64.   The venire members were questioned about their exposure to publicity about the case and their relationship with, or knowledge of, the Warners.  Impaneled jury members who had such exposure or knowledge indicated that they could be fair and impartial.  *See Simon*, 688 So. 2d at 804.  Accordingly, we find that the trial judge did not abuse his discretion in denying Hughes's motion to quash.

### C.   Cumulative error.

¶65.   We find that the assigned errors in the record before us are individually harmless.  *See Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003).  We further find that, when considered cumulatively, the effect of all assigned errors did not deprive Hughes of a fundamentally fair and impartial trial.  *Id*.

**CONCLUSION**

¶66.	Because we find Hughes's assignments of error to be without merit, we affirm his conviction and sentences.

¶67.	**COUNT I: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCES IMPOSED IN COUNT II AND IN COUNT III ARE TO RUN CONCURRENT TO EACH OTHER AND BOTH ARE TO RUN CONCURRENT TO THE SENTENCE IMPOSED IN COUNT I.**

**SMITH, C.J., DIAZ, P.J., EASLEY, CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**