KITCHENS, Justice,
for the Court:
¶ 1. Justin Springer was convicted of capital murder by a jury in the Circuit Court of Lee County on May 6, 2011. The underlying felony was burglary. For this conviction, he was sentenced to life in the custody of the Mississippi Department of Corrections, without the possibility of parole. After the trial court’s denial of his post-trial motions, Springer appealed to this Court, alleging that the verdict was contrary to the overwhelming weight of the evidence. Finding that the verdict against Springer was not contrary to the overwhelming weight of the evidence, we affirm his conviction and sentence.
FACTS AND PROCEDURAL HISTORY

The Shooting Incident

¶ 2. On June 9, 2008, between 11:30 p.m and midnight, a reputed small-time drug dealer, Kamby Ivy, was shot during a home invasion at his girlfriend’s rented trailer home in Shannon, Mississippi. Ivy died shortly thereafter of two gunshot wounds to his chest and upper abdomen.
¶ 3. Earlier that night, Camanda Jami-son, Ivy’s girlfriend, had reported to her landlord that a burglary had occurred the night before, and another two weeks prior. She informed him that some change and “something else”[1] had been stolen. Jami-son explained to the landlord that she did not report either burglary to the police because she was scared. The landlord remembered seeing Ivy at the trailer that evening, but had not spoken with him.
¶ 4. According to Jamison’s statement to police, Ivy was shot later that evening by two men wearing white masks.[2] After being shot, Ivy had run across the street to Henry Gardner’s house and knocked on his door. After waking from his sleep, Gardner called the authorities and waited inside until an officer arrived. When the first responding officer arrived, he discovered Ivy dead on the porch. Ivy was unarmed and wearing only his boxer shorts.
*569 ¶ 5. One of the responding officers, Paul Duvall, testified at trial that, while traveling to the scene, he found Jamison, partially dressed and hysterical, in the middle of Highway 45. Officer Duvall put her in the back seat of his police car and proceeded to Gardner’s residence. Duvall testified that, en route, Jamison was able to indicate to him that Ivy actually had been shot at her home. From there, the officer had gone to Jamison’s home and secured the scene.
¶ 6. Officer Duvall also testified that, upon his arrival at Jamison’s trailer, he discovered the door ajar. Things were “tossed around” in the living room, and blood was found on the floor. The officer also testified that the door catch had been broken and that there was blood on a glass storm door. The officer noted that the physical evidence indicated that an altercation and struggle had taken place within the home.
¶ 7. Blood was recovered from the inside of the driver’s-side door of Ivy’s car, which was parked in front of Jamison’s trailer. The officers collected a pair of bloodstained khaki shorts and a cellular telephone from the ground near the vehicle. Two more cellular telephones were found inside the trailer. Two of these telephones were determined to belong to Ivy. Officer Duvall testified, without objection, that drug dealers often possess more than one cellular telephone.
¶ 8. While tracking Ivy’s route from Ja-mison’s trailer to Gardner’s residence, Officer Duvall recovered a mask made from a black t-shirt. The t-shirt mask later was sent to a laboratory for DNA testing, but the test results were inconclusive.
¶ 9. Officer Hollis, another responding officer, testified that, on the day following the shooting, Tonya Miller had called with information on Ivy’s death. She agreed to provide information in exchange for help with her pending DUI charge. Miller provided Officer Hollis the names of two men of interest, Justin Springer and Greg Kelly. She also asked Hollis to search the home of Mattie Mae Walton, possibly to locate the weapon used. An officer conducted a consensual search of Mattie Mae’s home, but no weapon was found.
¶ 10. Officer Hollis then went to the home of Springer’s father, Eddie Hughes. After identifying himself, Hollis informed Springer that he was not there to arrest him, but if he wanted to talk voluntarily, he could accompany the officers. Springer chose to accompany the officers to the Shannon Police Department. Once there, he was Mirandized[3] and interviewed by the Shannon Chief of Police. Springer denied any involvement in Ivy’s death. Springer claimed he was at a convenience store with Mattie Mae Walton at the time the murder was said to have occurred. Springer’s interview was recorded and played for the jury at trial.

Testimony at trial

¶ 11. At trial, Officer Joseph Beasley testified that he had been instructed to look for a weapon at Mattie Walton’s house. Beasley went to her home after dark on the day following the shooting to look in the garbage can, but found no weapon. He did, however, find a pair of blue jeans lying on top of the garbage can with a spent .22-caliber shell casing inside a pocket.[4] The cartridge casing was entered into evidence. Officer Beasley also *570 looked for a second mask. In the median of Highway 45, near Jamison’s trailer, he found a dark blue t-shirt with three holes cut into it. This second mask was not sent for laboratory testing.
¶ 12. Mattie Mae Walton testified for the State at trial. According to her, she had been with Springer, Greg Kelly, and Marquez Walton at her mother’s home in Nettleton on the night of the shooting. The four had left Nettleton together and traveled to Mattie Mae’s house in Shannon around dusk. She testified that, around 10:00 p.m., Springer and Kelly had left on foot with the stated intention of going to a nearby trailer park to “hang out.” Mattie Mae went on to say that, around 11:00 p.m., or shortly thereafter, Springer and Kelly returned to her house. She testified that they were sweating and had their shirts draped over their shoulders. When she asked what they had been doing, they claimed that they had been running and playing basketball. Mattie Mae further testified that, around midnight, she had asked Springer to drive her to a nearby convenience store so she could get medicine for a headache.
¶ 13. Mattie Mae said that she had received a phone call the following morning from her friend and neighbor Marlon Hughes,[5] who informed her of the death of Ivy the night before. Mattie Mae confronted Springer about Ivy’s death, but Springer denied having known him. After a series of phone calls, it became clear to Mattie Mae that Springer was suspected by members of the community of having been involved in Ivy’s death. Marlon Hughes later informed Mattie Mae that he had seen a pistol in her garbage can. She confronted Springer about the gun, but he denied any knowledge of its whereabouts. When Mattie Mae was interviewed by police on June 10 and 11, she gave consent to have her garbage can searched. No weapon was found. Later in September, Marlon Hughes gave a statement which corroborated Mattie Mae’s testimony.
¶ 14. Derrick Denman also testified for the State at trial. He related that, a week prior to the shooting, Springer had shown up at his home with a quarter pound of stolen marihuana. Denman testified that Springer told him he had stolen the drug from a pink and white trailer with a small porch on it, a description which matched the trailer at which Ivy later was killed. Denman also testified that, two or three days before the shooting, Springer, Kelly, and Walton had returned to his house. During that visit, Springer told Denman he planned to go back to the trailer to steal some more marihuana, because he was getting low.
¶ 15. Marlon Hughes, a close friend of both Ivy and Mattie May, also testified for the State. He testified that he had called Mattie Mae on the morning of the shooting and told her to get Kelly and Springer out of the house. He also testified that he had seen a gun wrapped in a blue bandana under the garbage can at Mattie Mae’s house.
¶ 16. Another witness for the State was Anna Clark. Clark testified that, on the night of the shooting, Springer and two black males had stopped by her house to use her telephone. When finished with the telephone, Springer told Clark they were on their way to Ivy’s house on Willow Street. Clark also testified that Springer had on a white shirt and black coveralls.
¶ 17. As its sole witness, the defense called Police Chief Desiree Kershner, who had interviewed Camanda Jamison on the night of the shooting. Chief Kershner testified regarding Jamison’s emotional state *571 on the night of the shooting. Kershner said that Jamison had recalled that one of the men had a gun pointed at her and Ivy. Later, she recalled that both men had carried short-barreled handguns. Kersh-ner testified that Jamison had stated that one of the men (later determined to be Kelly) had held her down with both of his hands. Kershner testified that no fingerprints were taken at the crime scene and no footprint casts were made. Kershner also confirmed that only one mask was submitted for DNA testing, and that the results were inconclusive. She further testified that no weapon had ever been recovered.

Accomplice Greg Kelly’s involvement and testimony

¶ 18. On June 10, 2008, after hearing of Springer’s meeting with Shannon police, Greg Kelly and his mother drove to the Nettleton Police Department. Kelly gave a statement about the shooting in Shannon the night before. Nettleton Police contacted the Shannon authorities and Kelly was detained.
¶ 19. Under a plea agreement, Kelly testified against Justin Springer at his trial. Kelly was initially charged jointly with Springer in the killing of Ivy; however, prior to trial, he pled guilty to manslaughter and burglary, receiving two concurrent twenty-year sentences. Kelly testified that he, Springer, and Marquez all left Mattie Mae Walton’s house on the night of the shooting and walked over to the nearby trailer park. After stopping by Anna Clark’s house to use the telephone, Springer asked Kelly whether he was ready “to go hit a lick,” meaning to rob someone, to which Kelly agreed. Kelly testified that he and Springer discussed no aspect of their intended crime, and that he did not know Springer was armed until they had entered Jamison’s trailer.
¶20. Kelly also testified that the two had put on t-shirt masks before entering. He claimed that Springer had entered the trailer first, and that he had followed behind. Kelly described the woman in the trailer as having been very upset, so he had restrained her on the couch. Kelly said Springer asked the man where “the stuff was at” and the man responded that he did not have any. Kelly testified that, while he was focused on restraining the woman, he heard a “loud noise,” which he presumed to be a gunshot. He said that, at that point, he had taken off running through the front door. He further testified that Ivy was unarmed and did not threaten Springer. Kelly denied having possessed or used a weapon during the burglary and shooting.
¶ 21. Kelly further testified that he disposed of his mask while running down Highway 45. He stated that Springer later had caught up with him, and that the two immediately had returned to Mattie Mae’s home, where they stayed for the remainder of the evening.
¶ 22. Kelly corroborated the testimony of Derrick Denman by testifying that he and Springer had gone over to his house several days before the shooting incident. Kelly also admitted that the Shannon Chief of Police had promised to help him obtain affordable bail if he cooperated in Springer’s prosecution.
DISCUSSION
¶ 28. Springer raises but one issue on appeal: whether the verdict was contrary to the overwhelming weight of the evidence.
¶24. Springer argues that all of the State’s key fact witnesses had motives to fabricate their stories. He claims that the only person who did not have any such motive was Camanda Jamison, and that her statement contradicts that of his al *572 leged accomplice, Greg Kelly. To support this position, he asserts the following: Tonya Miller was helped with her DUI case; Marlon Hughes made a deal to avoid a probation revocation; Greg Kelly received a reduced sentence for his cooperation in Springer’s prosecution; Derrick Denman received assistance with a pending felony charge; and Mattie Mae Walton testified under the fear that, if she failed to cooperate, her children would be taken from her by the Department of Human Services.
¶25. Further, Springer asserts that a contradiction between Kelly’s testimony and Jamison’s recorded interview supports the conclusion that the verdict was against the overwhelming weight of the evidence. First, Jamison stated that the two assailants were wearing white masks. However, the t-shirt masks recovered by police were black and dark blue. Second, Jami-son said that both men were carrying short-barreled handguns. However, Kelly testified that he did not have a gun in his possession at the time of the robbery.
¶ 26. This Court will disturb a verdict “when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844 (Miss.2005). This Court views the evidence “in the light most favorable to the verdict,” and the State “receives the benefit of all favorable inferences that may reasonably be drawn from the evidence.” Hughes v. State, 983 So.2d 270, 277-78 (Miss.2008). We find that the verdict in this case was reasonable given the evidence presented, and that it is not so contrary to the evidence as to permit an “unconscionable injustice.” Bush, 895 So.2d at 844.
¶ 27. The jury, being the final judge of witness credibility, chose to believe the testimony of the State’s witnesses rather than Springer’s theory of innocence. The State presented direct evidence of Springer’s guilt, including the testimony of his accomplice, Greg Kelly. Kelly’s testimony was corroborated by additional witnesses.
¶ 28. Springer’s argument that the verdict is contrary to the overwhelming weight of the evidence, based on the contradictions between Jamison’s recorded statement and Greg Kelly’s testimony, is without merit. Jamison’s description of the intruders as having worn white masks, when, in fact, they had worn dark masks, was before the jury. Moreover, Jamison’s statement that the two men had wielded short-barreled handguns, versus Kelly’s claim that he was unarmed, was a discrepancy of which the jury was fully aware, but clearly deemed inconsequential. In addition to weighing Jamison’s statement against that of Kelly, the jury heard testimony that Jamison’s statement was given hours after the event in question. By her own admission, and Officer Duvall’s testimony, Jamison was hysterical on the night after the violent invasion of her home. It is not unreasonable that a jury may have concluded that the discrepancies could be explained by this additional circumstance.
¶ 29. Additionally, Springer’s argument that all of the State’s witnesses had reasons to fabricate their stories was heard and rejected by the jurors, the sole judges of witness credibility. The testimony of multiple witnesses supported the State’s version of the events on the night in question and formed a sufficient basis for the guilty verdict.
¶ 30. We find that the verdict against Springer was not against the overwhelming weight of the evidence, and we affirm the conviction of Justin Springer for capital murder.
¶ 31. CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE, *573 WITHOUT THE POSSIBILITY OF PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, CHANDLER, PIERCE AND KING, JJ., CONCUR. LAMAR, J., NOT . PARTICIPATING.

. Jamison later told authorities that the "something else” which had been stolen was seven ounces of marihuana.

. Camanda Jamison died of natural causes prior to trial. Just after the shooting, a recorded interview was taken by Shannon Police Chief Desiree Kershner and Investigator Steve White with the Lee County Sheriff’s Department. At trial, the defense stipulated to its being played for the jury during the State’s case in chief. The defense called Chief Kershner as its sole witness. In that interview, Jamison described two men carrying pistols, wearing white masks, and forcing their way through her door. The admissibility of the hearsay from that police interview has not been raised on appeal.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The bullet fragments recovered from Ivy’s body were said to be consistent with a .22 caliber. However, the crime laboratory's examination was inconclusive as to whether the bullet had been fired from a handgun or a rifle.

. Marlon Hughes testified for the State at trial.