# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-00195-SCT

*DAMARIS QUINN a/k/a DEMARIS QUINN a/k/a*
*DEMARIS Q. QUINN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/29/2024 |
| TRIAL JUDGE: | HON. LEE JACKSON HOWARD V |
| TRIAL COURT ATTORNEYS: | COLLEN LEIGH HUDSON |
| | SCOTT WINSTON COLOM |
| | MARC DARREN AMOS |
| | MARLIN MARCELLUS STEWART III |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/24/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., CHAMBERLIN AND SULLIVAN, JJ.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1. Damaris Quinn was convicted in the Clay County Circuit Court of attempted murder under Mississippi Code Section 97-1-7(2) (Rev. 2014) and possession of a firearm by a convicted felon under Mississippi Code Section 97-37-5 (Rev. 2014). The trial court sentenced Quinn to thirty-five years' imprisonment in the custody of the Mississippi Department of Corrections for the attempted murder conviction and to five years'

imprisonment for the firearm possession conviction, with the sentences to run consecutively.

¶2.     Quinn appeals his attempted murder conviction, claiming that the trial court erred by denying a jury instruction related to his defense and that there is insufficient evidence to support his attempted murder conviction.  Finding no merit to either claim, we affirm Quinn's convictions.

**FACTS**

¶3.     On October 18, 2016, Quinn shot his wife, Basheeba Ward, five times using a .32 caliber revolver loaded with "100 grain lead wadcutters."  The shooting occurred around 11:00 a.m. at Quinn's mother's house, where the couple was living along with Ward's three children.

¶4.     Prior to the shooting, Quinn was at home that morning with Ward's nine-month-old twins, while Ward was at her mother's house with the father of Ward's children working on a poster for their oldest daughter's school project.  Quinn, who knew what Ward was doing, began texting and calling Ward, telling her she needed to come home because Quinn's mother wanted Ward to come get the twins.  Ward told Quinn she was on her way home, but she continued working on the poster.  Afterwards, Ward took the poster to the school and then returned to her mother's house to visit her mother.  Ward eventually headed home, stopping along the way to pay a water bill.

¶5.     According to Ward, when she arrived home, Quinn's aunt Angela Conley was inside holding Ward's baby daughter.  Ward's baby son was also inside sitting in his car seat.

Quinn's mother, Cheryl Cummings, arrived at the house soon after Ward had arrived and went inside the house.

¶6.     At that point, Quinn said he wanted to talk to Ward, and the two walked outside. Quinn asked Ward why she was not wearing her wedding ring. Ward told him that it was in her car. Ward told the jury at trial that the reason she was not wearing her wedding ring was because she was planning to leave Quinn, but she did not tell Quinn that at the time.

¶7.     Afterwards, Ward walked back into the house to get her twins ready to take them to her mother's house, and Quinn followed her inside. As Ward was getting the twins; bag ready, she turned around and saw Quinn pull out a gun. Quinn was standing about three steps away from Ward and began firing the gun at Ward.

¶8.     Ward testified that the first shot went through her left leg; the second shot hit her left arm; the third shot hit her left elbow. The fourth and fifth shots hit Ward in the chest, with one hitting Ward under her left breast and the other striking Ward's chest and breaking her collarbone. Ward said the bullets that hit her arm and her collarbone still remain there.

¶9.     Ward said she blacked out briefly after being shot. When she came to, she saw Quinn sitting on the bed reloading the gun. Ward got up and ran out of the house. Ward initially tried get to one of the cars outside, but she saw Quinn come out of the house pointing the gun at her. Ward then ran to her neighbor's house, where she stayed until an ambulance and law enforcement arrived.

¶10.    Ward said that she was taken to the hospital in West Point, Mississippi, and then airlifted to a hospital in Tupelo, Mississippi, where surgery was performed on her elbow. Ward said they did not remove the bullet "by my chest" because it is near a main artery.

¶11.    Conley, Quinn's aunt, testified on behalf of the State. Conley said that when Ward arrived at the house prior to the shooting, they were all outside on the porch. Quinn told Ward he wanted to talk to her, and the two of them went inside the house. Conley said she later heard a "tap, tap, tap" noise coming from inside the house. Conley went inside the house and saw Quinn's mother, Cummings, in the corner with Ward. Conley told Ward to run. According to Conley, the sounds she heard did not sound like shots from a gun; rather, it was "[j]ust a little tap," from "a little pellet gun thing."

¶12.    Afterwards, Conley told Quinn to give her the gun. Quinn handed Conley the gun, and she put it in her car. Conley said that they then heard sirens, and at that point, Quinn lay on the ground until law enforcement arrived.

¶13.    Investigator Terry Scott with the Clay County Sheriff's Office testified that he was dispatched to the scene following a 911 call that someone had been shot. Once there, Investigator Scott photographed and processed the scene inside and outside of the house where the shooting had occurred.

¶14.    Investigator Scott recovered a box of .32 caliber wadcutter cartridges from the bed in one of the house's bedrooms. He also recovered a .32 caliber revolver from the front seat of a vehicle parked in front of the house. Investigator Scott later took a statement from Ward at the hospital, and he took a photograph of Ward as she lay in the hospital bed.

4

¶15.    Following the State's case, the defense moved for a directed verdict on the attempted murder charge, asserting that the State failed to establish the element of intent for attempted murder.  The trial court denied the motion.

¶16.    Quinn's mother, Cummings, was the only person to testify during the defense's case-in-chief.  Cummings testified that she and Conley were standing outside holding the babies while Quinn and Ward were inside the house talking.  According to Conley, she "heard some bumping, bumping" from inside the house.  Conley went inside and saw Quinn standing in the living room, and Ward "was over in the corner."  Conley went over to Ward, helped her up, and the two of them ran out of the house.  Conley said that Ward "had a little blood on her," so Conley got a wet towel and began cleaning Ward.  Conley sat with Ward until the ambulance arrived.

¶17.    The jury found Quinn guilty of both attempted murder and possession of a firearm by a convicted felon.  Quinn appeals his attempted murder conviction, asserting two issues. One,  the State failed to prove the charge of attempted murder with sufficient evidence.  Two, the trial court erred by denying jury instruction D-5, which Quinn contends was relevant to his defense.

**DISCUSSION**

¶18.    Whether to grant or deny a proposed jury instruction lies within the trial court's sole discretion, which this Court reviews under an abuse-of-discretion standard. *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012) (citing *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010)).  "No

one instruction should be singled out[,]" and this Court will consider "the jury instructions as a whole to determine whether an error has occurred." *Id.* (citing *Newell*, 49 So. 3d at 73)

¶19.   "A defendant is entitled to have jury instructions given which present his theory of the case[,]" but this is limited "in that the trial court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* (internal quotations marks omitted) (quoting *Newell*, 49 So. 3d at 74).   "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found."   *Id.*   (alteration in original) (internal quotation marks omitted) (quoting *Newell*, 49 So. 3d at 73).

¶20.   In reviewing a challenge to the legal sufficiency of the evidence in a criminal trial, this Court considers whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Body v. State*, 318 So. 3d 1104, 1108 (Miss. 2021) (internal quotation marks omitted) (quoting *Parish v. State*, 176 So. 3d 781, 785 (Miss. 2015)).   This Court views all of the evidence in the light most favorable to the prosecution, accepts all the evidence supporting the verdict as true, and gives the prosecution "the benefit of all reasonable inferences flowing from the evidence." *Hogan v. State*, 755 So. 2d 1073, 1075 (Miss. 2000) (citing *Rhodes v. State*, 676 So. 2d 275, 281 (Miss. 1996)).

## I.    Jury Instruction D-5.

¶21.   Quinn proffered jury instruction D-5, which reads as follows:

Damaris Quinn is charged in Count 1 of the indictment with attempted murder.

The Court instructs the jury that as to Count 1 of the Indictment, "Homicide" is when a person kills another person, and Murder is a type of homicide.

"Murder" is the killing of a human being unlawfully and with deliberate design.

The Court further instructs the jury that "deliberate design" is when a person decides to unlawfully kill another person, and there is no legally justifiable or excusable reason for doing so.

¶22. Quinn argues that his defense theory at trial was that he did not intend to murder Ward when he shot her. He contends that instruction D-5 properly defined murder, distinguished the offense from other types of killings, and provided the state of mind required to commit murder. Thus, the trial court denied him his theory-of-the-case defense when it refused instruction D-5.

¶23. The State argues that jury instruction S-1 properly tracked the attempted-murder statute. Jury instruction S-1 reads in part as follows:

If you find from the evidence in this case beyond a reasonable doubt that:

1.      On or about October 18, 2016, in Clay County, Mississippi;

2.      Damaris Quinn unlawfully designed and endeavored to commit the murder of Basheeba Ward;

3.      By committing the act of shooting Basheeba Ward multiple times with a firearm, but

4.      Damaris Quinn failed therein and/or was prevented from murdering Basheeba Ward, then you shall find the defendant guilty of attempted murder.

If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Damaris Quinn not guilty in Count 1.

¶24. Jury instruction S-1 fairly tracked what this Court has held is necessary to prove the crime of attempt: "(1) an intent to commit a particular crime; (2) a direct ineffectual act done

7

towards its commission; and (3) the failure to consummate its commission." ***Brooks v. State***, 18 So. 3d 833, 841 (Miss. 2009) (citing ***Hughes v. State***, 983 So. 2d 270 (Miss. 2008)). We find no merit to this issue.

## II. Sufficiency of the Evidence.

¶25. Quinn contends that the State "failed to provide legally sufficient evidence at trial for a reasonable jury to find that the act Quinn designed and endeavored to commit would have constituted murder if accomplished." Quinn argues that the attempted-murder statute, Section 97-1-7(2), requires that he "design and endeavor to commit an act which, if accomplished, would constitute the offense of murder under [Mississippi Code] Section 97-3-19[.]" Quinn contends that the act he was accused of committing was shooting Ward, which he acknowledges was accomplished. But Quinn submits that nothing in the record indicates that he "intended to commit a murder but was unsuccessful."

¶26. The State submits that Quinn's intent can easily be inferred from his actions that day. And the only logical inference the jury could have made is that Quinn intended to kill Ward.

¶27. We agree with the State. Quinn's "underlying intent was a fact question for the jury to decide." ***Thomas v. State***, 277 So. 3d 532, 535 (Miss. 2019). "[I]ntent may be proved from facts surrounding the case[,] [and] a jury may infer guilty intent when considering the totality of the circumstances." ***Id.*** (citation omitted) (citing ***Hughes***, 983 So. 2d at 278-79; ***Ryals v. State***, 305 So. 2d 354, 356 (Miss. 1974)). Further, this Court has long recognized that "[m]alice or intent . . . , as a mater of law, may be proved or inferred from the use of a deadly weapon." ***Fairchild v. State***, 459 So. 2d 793, 802 (Miss. 1984) (citing ***Shields v.***

***State***, 244 Miss. 543, 144 So. 2d 786 (1962), *overruled on other grounds by* ***Flowers v. State***, 473 So. 2d 164 (Miss. 1985)).

¶28.    The State submitted evidence that Quinn shot Ward five times, emptied his gun of the bullets and reloaded the gun.  Quinn then followed Ward outside as she fled from the house while still pointing the gun at her.  Reasonable minds could infer from the evidence that Quinn intended to murder Ward.  This issue is without merit.

## CONCLUSION

¶29.    Quinn's convictions for attempted murder and possession of a firearm by a convicted felon are affirmed.

¶30.    **AFFIRMED.**

    **RANDOLPH,  C.J.,  KING  AND  COLEMAN,  P.JJ.,  MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS AND BRANNING, JJ., CONCUR.**