PITTMAN, Justice,
for the Court:
Norman Gangl was indicted for the offense of armed robbery. Although his first trial was declared a mistrial, he was convicted of armed robbery upon a second trial. On appeal to this Court, Gangl’s conviction was reversed and remanded for a new trial. Gangl v. State, 539 So.2d 132 (Miss.1989) (hereinafter Gangl I). At the third trial, the defense moved the court for a directed verdict as to the crime of armed robbery, and offered to plead guilty to the crime of accessory after the fact. The motion and offer were denied. The defense called two witnesses, rested its case, and then renewed its motion for a directed verdict. This motion was also denied.
The jury returned a verdict of guilty to the crime of armed robbery. The court sentenced the defendant to a term of eighteen (18) years in prison with the first ten (10) to be served and the last eight (8) to be suspended. Aggrieved by the outcome of his third trial, Gangl filed this appeal. We reverse his conviction and render judgment in his favor finding that the evidence was insufficient to support the verdict.
I.
On August 3,1985, at approximately 2:00 p.m., two white males entered the Sav-On drugstore located on Marion Avenue in McComb, Mississippi. At gunpoint, one of the men ordered Marilyn Reeves, a store employee, to empty the contents of one of the cash registers into a paper bag. A second store employee, Tommy McKenzie, was forced to empty a second cash register. The gunmen succeeded in taking $978.00 in cash from the drugstore. The second gunman demanded that Charles East, the store owner, give him specific drugs from the pharmacy. These included Dilaudid, Demerol and Morphine. East *334 proceeded to place the drugs into a “dirty-looking pillowcase.”
The two individuals were described as being white males between the ages of 25 to 30. The store employees testified that one gunman wore blue jeans and a red thermal long sleeved shirt while the other gunman wore jeans and a yellow long sleeved shirt. Each man was armed with a snub nose .38 special, one of which was black and the other silver.
One of the gunmen asked for the keys to a blue 1981 Buick, which belonged to Reeves and was parked in front of the drugstore. Reeves expressed some concern for her car but did hand over her keys. In response to Reeves’ concern, one of the gunmen stated that her car would “be a couple of blocks from here.” Reeves and East were ordered to go behind the counter and lay on the floor.
The gunmen left the drugstore and got into Reeves’ car. After the gunmen left, Reeves called the McComb Police Department. She explained to the police that the gunmen were escaping in a 1981 light blue Buick and gave them the tag number. She also told the police that she thought the men would be within a couple of blocks of the drugstore.
Meanwhile, Barry Bean, owner of Bean’s Sewing Center which is located three blocks from Sav-On, was traveling west on Harrison Avenue and approaching Marion. Just as Bean entered the intersection, he noticed a man run from the front of the drugstore and get into a car that was parked out front. The man got into the passenger side of the car because there was already someone behind the wheel. The car backed up and proceeded east on Harrison Avenue. Bean next saw McKenzie and East come out of the drugstore. McKenzie got into his pickup and went in the same direction as the car carrying the gunmen.
Bean next proceeded to circle the Sav-On drugstore and eventually stopped in the parking lot of Fred’s where he noticed that Reeves’ blue Buick had been abandoned. A short time later, Bean saw two individuals running from an alley along the side of the Fred’s building. Bean stated that one man was wearing only jeans and tennis shoes, while the other one was wearing a red pullover shirt and blue jeans.
The man wearing the red shirt, proceeded across Delaware Street and toward an Exxon station located at the corner of Hart Road and Delaware. The man walked up to the passenger side of a white Chevrolet Monte Carlo. The Monte Carlo had been backed into a parking spot against the building and was facing away from the building. After a minute or two, the man got into the Monte Carlo.
Bean stated that the man was carrying “some type of sack.” Bean lost track of the other man and didn’t know where he went. The Monte Carlo proceeded east on Delaware. Bean met the car head on and noticed two occupants.
At approximately 2:00 p.m., Officers Don LeCour and Steve Rushing were on routine patrol when they came upon the Sav-On drugstore. East was running back and forth in front of the store in a highly agitated manner and explained to the officers that he had just been robbed at gunpoint. Rushing informed police headquarters that there had been an armed robbery and then proceeded in the direction of Fred’s looking for the suspect vehicle. The officers observed a blue car that fit the description of the blue Buick heading towards the interstate. Upon nearing the vehicle the officers realized that there was a family in the car and that it was not the same car that had been involved in the robbery.
Then the officers turned around and proceeded back towards Fred’s. Upon entering the parking lot, the officers again observed a blue car that fit the description first given. Again the officers proceeded to chase the vehicle only to discover that this was not the suspect vehicle.
As the officers proceeded back to McComb, the radio dispatcher informed them that there had just been another armed robbery at Eckerd’s drugstore. The dispatcher, however, was mistaken. Upon entering McComb, the officers were in *335 formed by the dispatcher that the suspects were traveling in a white Monte Carlo. The officers observed a vehicle matching that description headed west towards the interstate. The officers observed only one person in the vehicle upon passing it head on. Rushing turned his patrol car around and proceeded to follow the Monte Carlo onto the overpass at Delaware Avenue. The officers attempted to stop the vehicle; however, the car went down an embankment and onto the entrance ramp of Interstate 55. An attempt by Officer C.V. Glyn-nis to shoot the suspect’s tires failed.
Officer LeCour described the driver of the vehicle as having a pony tail and wearing no shirt. He also stated that the driver had numerous tattoos on his arm. LeCour saw only one person in the vehicle.
LeCour and Rushing proceeded to pursue the suspect on 1-55 at speeds of up to 115 MPH. Several other McComb police units joined in the chase. Each time Officer Rushing attempted to pass the Monte Carlo the driver attempted to run him off the road. Finally, Rushing managed to slow him down, but the vehicle crossed the grass median and proceeded to head south in the north bound lane of 1-55. Officer LeCour refused to pursue the Monte Carlo across the median because of the high degree of danger involved. Instead, he proceeded to exit the interstate on the correct side of the highway. Upon exiting the interstate, LeCour observed that the white Monte Carlo had hit a tree and was in a ditch on the side of Highway 24.
Officers LeCour, Rushing and Glynnis took up positions around the area and radioed for backup. Backup arrived, and the area was “sealed off.”
At approximately 4:15 p.m., LeCour observed a subject coming down the entrance ramp. The subject had no shirt and matched the description of the driver of the car. The suspect was arrested by LeCour 250-300 yards from the wrecked car. The suspect was muddy, shirtless, and had fresh scratches about his face and neck. LeCour identified the suspect as Norman Gangl. No other suspects were arrested with Gangl.
A search of the car by investigator Perry Ashley uncovered a large quantity of drugs found in a paper bag. A pillowcase containing a quantity of drugs was also found on the front seat of the Monte Carlo. East identified these drugs as those stolen from the Sav-On drugstore. Ashley also recovered a nickel plated Colt .38 special and a red pullover shirt from the front seat of the Monte Carlo. In an alley near the Sav-On drugstore, Ashley found a. bag of money, a black gun, and a set of car keys which were later identified as belonging to Mrs. Reeves.
II.
Gangl raises several issues on appeal, but only one issue warrants discussion since it is dispositive of this case.
Gangl contends that the evidence was insufficient to support the verdict of armed robbery. In Burge v. State, 472 So.2d 392 (Miss.1985), this Court stated that all evidence, even that which does not support the State’s case, must be considered in the light most favorable to the State. Id. at 396. See also May v. State, 460 So.2d 778, 781 (Miss.1984). “[T]his court must accept as true the evidence which supports the verdict.” Spikes v. State, 302 So.2d 250, 251 (Miss.1974). The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Glass v. State, 278 So.2d 384, 386 (Miss.1973). See also Johnson v. State, 452 So.2d 850, 853 (Miss.1984); Winters v. State, 449 So.2d 766, 771 (Miss.1984); Bullock v. State, 447 So.2d 1284, 1286-87 (Miss. 1984); Dickerson v. State, 441 So.2d 536, 538 (Miss.1983); Gandy v. State, 438 So.2d 279, 285 (Miss.1983).
Gangl’s main contention is that the State has shown no direct evidence that the appellant was an accessory before the fact. None of the witnesses that testified at trial saw Gangl prior to or during the armed robbery. The first time anyone saw Gangl was approximately 20 minutes after the commission of the armed robbery when Officer LeCour identified Gangl as the driver of the white Monte Carlo.
*336 At trial, there was testimony that Gangl and the two gunmen were all from Birmingham, Alabama. Although one of the gunmen indicated to Reeves that they would leave her car a few blocks away implying that they had a getaway car waiting for them, one cannot infer that Gangl knew what his companions were planning prior to the commission of the crime. For example:
While keeping in mind that each circumstantial evidence case turns on its own facts, and that it is peculiarly within the jury’s province to draw reasonable inferences based upon its own experience and common sense, we have previously rejected the concept of guilt by association. Matula v. State, 220 So.2d 833, 836 (Miss.1969).
Hester v. State, 463 So.2d 1087, 1093 (Miss. 1985) (emphasis added).
In Lewis v. State, 573 So.2d 719 (Miss. 1990), Anthony Wimberly and Frederick Lewis were both convicted of felony shoplifting. On June 5, 1987, they drove from Jackson to Starkville, Mississippi. Later, they drove to the Wal-Mart in West Point. Both Wimberly and Lewis were accused of taking merchandise from the Wal-Mart store. This Court, however, on appeal reversed and rendered Lewis’ conviction.
The facts in Lewis are similar to those in the case at hand. “Lewis was indicted as a principal, not as an accessory after the fact.” Lewis, 573 So.2d at 723. Lewis was never seen inside the store, and the only evidence which connected him to events prior to the crime was the fact that he rode to the store with Wimberly. This Court held:
There is no evidence that he knew that the shop-lifting episode was taking place, nor that it was planned. There is no evidence that he was aware that either Wimberly or Wimberly’s mother was involved in such an episode. The record shows that he did ride with Anthony Wimberly when they left the Wal-Mart store, and that Wimberly was driving at a high speed....
... While we understand that Lewis’s presence and his conduct following the episode at Wal-Mart casts strong suspicion upon him, we are constrained to say that a reasonable juror, properly understanding the responsibilities of that office could not, under the facts disclosed in this record, have found Lewis guilty beyond a reasonable doubt. See Steele v. State, 544 So.2d 802, 809 (Miss. 1989) (the State may prove a crime by circumstantial evidence, but where the case is based wholly on circumstantial evidence, the State must prove the defendant’s guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence).
Lewis, 573 So.2d at 723 (emphasis added) (footnotes omitted).
The State failed to prove Gangl’s guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence. This standard was established as early as 1853 in Algheri v. State, 25 Miss. 584 (1853). In Algheri, this Court stated:
A distinguished writer on the law of evidence has said, that “it is always insufficient, where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be.” 1 Stark, on Ev. 572.
Id. at 589 (emphasis added).
There was no evidence to show that Gangl was aware of his companions’ activities prior to the actual commission of the armed robbery and no reasonable inference from other evidence to show any such knowledge by Gangl. The jury could not on the evidence have found Gangl guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence as an accessory before the fact to the crime of armed robbery. Thus, the *337 evidence presented at trial was insufficient to support the conviction of armed robbery.
As in Lewis, Gangl’s actions after the commission of the crime are certainly suspicious, and there is evidence to support a conviction of accessory after the fact. Gangl, however, was not indicted as an accessory after the fact, and therefore, his conviction of armed robbery must be reversed and rendered.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.