# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00116-COA

**CONNELL GRAY A/K/A CONNELL GRAY, JR.**          **APPELLANT**
**A/K/A CORNELL GRAY, JR.**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/2019 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH III |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/25/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND SMITH, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.    Connell Gray was convicted of first-degree murder in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014) and sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). Gray filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The Coahoma County Circuit Court denied Gray's motion. Gray appeals, challenging the sufficiency and the weight of the evidence. Finding no error, we affirm.

## FACTS

¶2.     The events leading up to the murder of Myrtle Messenger on March 14, 2015, involve two distinct groups of friends. Michael Messenger Jr.,[1] James "Scoop" Bryant, Roger Grace, Cornelius Magee, and Britney King (Scoop's girlfriend) had been riding around together on the day Myrtle was shot. A separate group consisting of Gray, Dantrail "Pole" Jackson, and Jamaal Stafford had been hanging out together before Myrtle was shot. Two separate altercations involving members of each group occurred on the day of Myrtle's death. The second altercation stemmed from the first one.

¶3.     The day Myrtle was killed, Michael, Scoop, Grace, and Magee were drinking and riding around in Clarksdale when they pulled over so Michael could talk to a girl. Pole appeared on the scene and threatened to shoot and kill Michael because Michael was talking to his girlfriend. Gray was not present at that time.

¶4.     Michael and his friends drove away and continued riding around. They eventually ended up at the Benny Gooden Estates apartments where there was another altercation with Pole. It became physical when Pole pushed Michael, who left the apartments with Shun Sykes and had no other interaction with anyone from either of the two groups that evening. Scoop then left King waiting in the parking lot with Grace and went back into the apartment with Pole. Upon his return to the parking lot, Scoop told King that he knocked Pole out and took his gun. King testified that all of the men then came out to the parking lot. She said she saw Gray get out of a car before Scoop's cousin hit him in the face. King left, dropped Scoop off a gas station, and went to Grace's house. Later that night, King agreed to drive

_____

[1] Michael is Myrtle's grandson. He also lived with her.

Grace to see his girlfriend in Jonestown, Mississippi. While they were on the way, sometime between 10 p.m. and 12 a.m. they passed Gray and Pole in a vehicle.

¶5. Gray did not testify, but the jury heard a taped interview of him at the Clarksdale Police Department. Gray admitted to officers that he was at the apartment, but he stated that he was not involved in the fight and did not get hit. He said that someone told him about Pole's fight with Scoop and that he heard Scoop say he had taken Pole's gun. Gray said he knew about the altercation between Michael and Pole earlier in the day and he knew Pole was angry, but he did not know what the fight was about.

¶6. After the altercation at the apartments, Pole acquired another gun. Gray denied knowledge of Pole's gun, but Gray admitted that he also obtained a gun sometime that day. Gray said that he and Pole walked to Myrtle and Michael's house between 10 and 11 p.m. Gray stated that he had no idea that Pole planned to kill anyone. Gray claimed that he stood on the street while Pole knocked on the door. According to Gray, Pole shot Myrtle when she opened the door. Gray admitted fleeing the scene, running through an alley, and throwing his gun in the brush after hearing the shot. Gray also admitted meeting up with Pole again after the shooting, but he said that Pole got in a car and left by himself.

¶7. After the murder, Deputy Stephen James of the Coahoma County Sheriff's Department encountered four men in the alley near Myrtle and Michael's house. They were detained and released after a call to dispatch to see if there were outstanding warrants. Gray was not one of these four men, although Pole was. Officers also recovered two guns in the same alley. Gray told officers that the semiautomatic pistol was his, but King testified that

she had seen him with a revolver earlier in the day. A ballistics expert determined that the revolver was the murder weapon. Two shots had been fired from the revolver and none from the semiautomatic pistol.

¶8. On December 9, 2015, Gray was indicted and charged with one count of first-degree murder with an added firearm enhancement. After a jury trial in December 2019, Gray was convicted of first-degree murder and sentenced to life in the custody of the MDOC. The circuit court denied Gray's motion for judgment notwithstanding the verdict or, in the alternative, a new trial, and he now appeals.

## STANDARD OF REVIEW

¶9. "In reviewing a challenge to the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prosecution and accept all evidence supporting the verdict as true." *Dampeer v. State*, 989 So. 2d 462, 464 (¶7) (Miss. Ct. App. 2008). We will not disturb a conviction based upon circumstantial evidence "unless it is opposed by a decided preponderance of the evidence." *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988). "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Anderson v. State*, 62 So. 3d 927, 944 (¶60) (Miss. 2011).

## DISCUSSION

I. **Whether there was sufficient evidence to find Gray guilty of first-degree murder.**

¶10. Gray argues that there was insufficient evidence to prove that he committed any act

4

in furtherance of the murder. He submits that there is no evidence to show that he had prior knowledge of Pole's criminal intent, that he participated in the crime in any way, or that he committed the homicide. Gray asserts that he was merely present near the scene.

¶11. Gray was convicted pursuant to section 97-3-19(1)(a). "To prove first-degree murder, the State must show that a person was killed 'without the authority of law' and that the killing was 'done with the deliberate design to effect the death of the person killed[.]'" *Adams v. State*, 291 So. 3d 405, 409 (¶11) (Miss. Ct. App. 2020) (quoting section 97-3-19(1)(a)). Gray did not have to pull the trigger to be found guilty. "When two people act in concert or when one person aids another in committing . . . a crime, both are equally guilty as principals in the eyes of the law." *Lipsey v. State*, 756 So. 2d 823, 825 (¶4) (Miss. Ct. App. 2000); *see also Malone v. State*, 486 So. 2d 360, 364 (Miss. 1986) (holding that "an accessory before the fact or one who aids and abets . . . participates in the design of the felony").

¶12. Gray argues that the State produced no evidence sufficient to sustain his conviction. Indeed, there is no direct evidence linking Gray to the crime for which he was convicted. But "direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Campbell v. State*, 798 So. 2d 524, 528 (¶12) (Miss. 2001) (quoting *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998). "[C]ircumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985). We note that a jury may also infer participation based on

5

one's presence, companionship, and conduct before and after the offense. *Hubbard v. State*, 187 So. 2d 885, 886 (Miss. 1966).

¶13.   In support of his argument Gray cites *Steele v. State*, 544 So. 2d 802, 809 (Miss. 1989), where the Supreme Court reversed a conviction based solely upon circumstantial evidence.  Steele was caring for a small child who died from massive head injuries.  The State's theory was that Steele physically abused the child, causing his death; Steele's theory was that the injuries were caused when the child fell out of the bed.  Physical evidence did not support either theory.  Testimony from physicians regarding the cause of death was inconsistent. The Supreme Court held that the State proved only that the child's injuries were probably not caused by a fall from a bed, and that the State failed to prove Steele's guilt because it did not exclude the possibility that the injuries were caused by a fall.  The Supreme Court in *Steele* held that "the State's proof of criminal agency was so deficient that no reasonable hypothetical juror could have found, beyond a reasonable doubt and to the exclusion of every *reasonable* hypothesis consistent with innocence, that Steele killed [the victim]." *Id.* (emphasis added).

¶14.   Gray's situation differs somewhat from that in *Steele*.  The issue is whether Gray intended to commit a crime instead of whether he fired the shot that killed Myrtle.  Prior Supreme Court rulings are instructive regarding "intent" in the context of circumstantial evidence and first-degree murder.  In *Holliman*, the Supreme Court held that despite Holliman's statement that the shooting was accidental, there were sufficient facts based on circumstantial evidence (including that his wife had asked for a divorce the morning of her

6

death and that Holliman moved the body and reported the death as a suicide) to uphold the jury's finding that he intended to kill his wife and was guilty of first-degree murder. *Holliman v. State*, 178 So. 3d 689, 699-700 (¶23) (Miss. 2015). In its ruling the Supreme Court stated: "This Court has held that unless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident." *Id.* at 698 (¶19) (quoting *Boyd v. State*, 977 So. 2d 329, 335 (¶23) (Miss. 2008) (internal quotation marks omitted)). In *Ware*, there were no witnesses to the victim's shooting, but there was testimony about an altercation earlier in the day and Ware admitted to being at the location of the shooting on the night in question. *Ware v. State*, 301 So. 3d 605, 612 (¶¶26, 30) (Miss. 2020). Ware claimed that gunshot residue discovered on his hands was from fireworks, and he said that there was another man with him at the time of the shooting. *Id.* at 613 (¶¶31-33). The jury found Ware guilty of first-degree murder and the finding was upheld by the Supreme Court. *Id*. at (¶35). The Court pointed out that Ware presented his theory of the case and just because "the only evidence supporting a conviction is circumstantial does not mean the evidence is insufficient." *Id*. at 612-13 (¶¶24, 34).

¶15.    In reviewing the legal sufficiency of the evidence, our authority to disturb the jury's verdict is quite limited. *Clayton v. State*, 652 So. 2d 720, 724 (Miss. 1995). Intent to commit a crime is a question of fact to be determined by a jury based on the facts presented in the case. *Walker v. State*, 913 So. 2d 198, 224 (¶82) (Miss. 2005) (citing *Knox v. State*, 805 So. 2d 527, 531 (¶14) (Miss. 2002)). This Court has held that "[t]he jury is charged with the

7

responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed. The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity." *Ford v. State*, 737 So. 2d 424, 425 (¶8) (Miss. Ct. App. 1999) (citation omitted). "Circumstantial evidence need not exclude every 'possible doubt,' but only every other 'reasonable' hypothesis of innocence." *Campbell*, 798 So. 2d at 529 (¶13) (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981)). Additionally, as this Court stated in *James*, although the State has the burden of providing evidence "to refute all reasonable hypotheses consistent with innocence[,]" the ultimate decision should not be taken away from the jury. *James v. State*, 777 So. 2d 682, 697 (¶46) (Miss. Ct. App. 2000).

¶16. Here, the State presented facts to the jury establishing motive and opportunity. Gray was able to present his version of the facts and alternate hypotheses to refute the State's theories. The jury in this case had the opportunity to evaluate King's testimony and hear Gray's interview with the police. After hearing that Gray hung out with Pole on the day of the shooting, and that he admitted that he was aware that Pole was angry with Michael, it was reasonable for the jury to conclude that Gray was part of Pole's deliberate design for revenge against Michael. It was also reasonable for the jury to determine that by obtaining a gun the day of the shooting and walking to the Messengers' home with Pole between 10 and 11 p.m., Gray indicated a willingness to participate in the murder. Although denied by Gray, the jury heard testimony that Gray was seen with a revolver (the same type of gun as the murder weapon) on the day of the shooting. The fact that Gray and Pole hid their weapons in the

8

same place as they fled the scene and met up after the murder could also have reasonably been interpreted by the jury as a part of the plan to commit a crime. There was sufficient evidence to find Gray guilty of first-degree murder.

## II. Whether the verdict was contrary to the weight of the evidence.

¶17. Even when the evidence is sufficient to support a conviction, a defendant may be entitled to a new trial if the trial court determines that the guilty verdict returned by the jury was against the weight of the more credible evidence presented at trial. *Fleming v. State*, 732 So. 2d 172, 183 (¶¶37-38) (Miss. 1999). In this instance, our review of the evidence leaves us unpersuaded that the State's case was so weak or the defendant's proof was so persuasive that the jury's decision to convict amounts to a manifest injustice. We decline to overturn the trial court's decision to deny Gray's motion for a new trial.

## CONCLUSION

¶18. We find that the State presented sufficient evidence that Gray acted in concert with Pole to commit murder and that reasonable jurors could have found Gray guilty based on the evidence presented at trial. Furthermore, the jury's verdict was not contrary to the overwhelming weight of the evidence, and no new trial is warranted. Finding no error, we affirm.

¶19. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

9

**WILSON, P.J., DISSENTING:**

¶20. Connell Gray's conviction must be reversed and rendered because the State presented insufficient evidence that Gray actually incited, encouraged, or assisted in the murder or participated in the planning of the murder. Accordingly, I respectfully dissent.

## FACTS

¶21. Michael Messenger Jr. (Michael) testified that around 3 or 4 p.m. on March 14, 2015, he was "riding around" Clarksdale and "drinking" with James "Scoop" Bryant (Scoop), Roger Grace, and Cornelius Magee. They stopped on Madison Street for Michael to talk to a woman. Dantrail "Pole" Jackson (Pole) saw Michael talking to the woman. The woman was Pole's girlfriend, and Pole became angry. According to Michael, Pole threatened to "kill" him, so Michael and his friends "pulled off" and "went to the store" and then continued to ride around drinking. Later, Michael and his friends went to the Bennie Gooden Estates apartments. Pole and Jamaal "Stack" Stafford (Stack) were there. Pole walked up to Michael and his friends, started "talking crazy," and pushed Michael. So Michael got in a car with Shun Sykes, and they left the apartments and went "riding around." Michael testified, "I am not too sure if [Gray] was . . . with [Pole and Stack at the apartments]. I just can't say if [Gray] was [with them]."

¶22. Scoop's girlfriend, Britney King, testified that sometime between 3 and 5 p.m. on March 14, 2015, she saw Scoop "in the middle of the street" on Madison Avenue "arguing with . . . Pole." King persuaded Scoop to get in the car with her, she took him to get some liquor, and then she dropped him off at Gas Mart with Grace and Michael. It is not clear

10

when exactly this incident occurred in relation to the events described by Michael.

¶23. Sometime between 7 and 9 p.m., King went to the Bennie Gooden Estates apartments to meet Scoop to go to a casino. Scoop met King in the parking lot and told her to wait for him while he went back inside the apartments to talk to Pole about the incident earlier in the day. Scoop later came back outside and said that he had "knocked out" Pole and taken Pole's gun. Scoop had the gun with him. Pole then came outside. Pole was angry and "talking smack." Others began trying to separate Pole and Scoop. King stated that she noticed Gray sitting in a car and that Gray got out of the car and tried to get Pole into the car. King testified that Gray was actually "trying to . . . stop the altercation, but it looked like [Gray and others] were trying to jump Scoop." At that point, Scoop's cousin, "Bardo," punched Gray in the face. Surveillance video from the apartment complex captured the argument between Pole and Scoop, but Gray cannot be seen anywhere on the video.

¶24. Eventually, Scoop returned to King's car, and King, Scoop, Bardo, and Grace all left the apartments. King "took Scoop to Gas Mart to get in another vehicle with one of his friends to talk about the issue." Bardo also went with Scoop. Then King and Grace went to Grace's house.

¶25. Around 11 p.m., Michael's grandmother, Myrtle Messenger, was shot and killed by a single gunshot wound to the neck when she answered a knock on the door of her house on Poplar Street. King and Grace heard the gunshot from Grace's house. They got in King's car and drove to the corner of Jefferson Avenue and Poplar Street, where other cars had

11

stopped. They saw Michael drop to his knees and start crying.[2] King and Grace then drove back to Grace's house. Grace asked King to drive him to his girlfriend's house in Jonestown, and King agreed. King testified that on Highway 61, they passed a green Honda that was "going slow." King testified that Gray was driving the Honda and that Pole was in the passenger's seat. She testified that this occurred sometime before midnight.

¶26.    Around 1:30 a.m., Coahoma County Deputy Sheriff Stephen James encountered four men in an alley across the street from the Messengers' house. One of the men was Pole. James and another deputy searched the men but "didn't find anything." They allowed the men to leave after determining that there were no warrants for their arrest. There is no evidence that Gray was one of the men. James testified that he was "not sure" if Gray was in the alley and that he did "not recall [Gray's] name."

¶27.    When James returned to the Messengers' home, someone told him that "Pole was a person of interest that they were looking for." James then searched the alley again and found two guns—a revolver and a semiautomatic pistol—that had been discarded in a brush pile about 50 or 60 yards from the Messengers' house. The police later determined that the revolver had been used to kill Myrtle Messenger.

¶28.    Detectives with the Clarksdale Police Department located Pole at the Bennie Gooden Estates apartments around 3 a.m. Gray was not with Pole at the time.

¶29.    Eleven days after the murder, Gray gave a voluntary statement to Detectives Charles Sledge and Frederick Burton of the Clarksdale Police Department. Gray's interview was

_____

[2] Michael lived with his grandmother and grandfather on Poplar Street.

recorded. Gray told the detectives that he went to the Bennie Gooden Estates around 7 or 8 p.m. on the day of the murder. He arrived after Scoop had taken Pole's gun, and he only witnessed the subsequent argument between Scoop and Pole in the parking lot outside the apartments. Contrary to King's testimony, Gray said that no one punched him.

¶30. Gray told the detectives that Pole apparently obtained a new gun after his altercation with Scoop, but Gray did not know how Pole obtained the gun. Gray also had a gun, a semiautomatic pistol. Gray told the detectives that he obtained the gun from Cedric Dukes on the day of the murder because he had previously loaned his usual gun to a friend. It is not clear when exactly Gray obtained the gun from Dukes.

¶31. Pole and Gray later left the Bennie Gooden Estates and walked to Madison Avenue. While they were hanging out near the corner of Madison Avenue and Magnolia Street, Gray overheard Pole tell his girlfriend that "it was because of" her or that "it was [her] fault." Pole then walked up Madison Avenue and turned on Poplar Street, and Gray walked with him. The Messengers' house was on Poplar Street about two blocks from Madison Avenue. When they reached the Messengers' house, Pole turned into the Messengers' yard and knocked on the door, but Gray continued walking down Poplar. Gray then heard a gunshot. Gray told detectives that he panicked, ran down the alley across the street from the Messengers' house, and discarded the semiautomatic pistol[3] in a brush pile in the alley. At the end of the alley,

---

[3] Sledge testified that he "kind of recalled that [King] stated that [Gray] had a revolver at that apartment complex." However, King did not testify that she saw Gray with any kind of gun on the day of the murder. As noted above, King only saw Gray briefly when he stepped out of his vehicle at the Bennie Gooden Estates. Thus, the majority opinion is incorrect in stating that "King testified that she had seen [Gray] with a revolver earlier in the day." *Ante* at ¶7.

13

Gray turned on Magnolia Street and ran back to Madison Avenue. Pole ran down the alley after Gray and "popped up on Madison" "two or three minutes" later. Gray told detectives that Pole did not say anything about the shooting. According to Gray, Pole made a call on his phone and then got in a "silver car" and left. Gray did not know who else was in the silver car.

¶32. In December 2015, Pole and Gray were jointly indicted for first-degree murder.[4] Gray's case went to trial in December 2019.[5] At trial, Detective Sledge acknowledged that there was no evidence that Gray killed Myrtle Messenger. He testified that Gray was arrested and charged with murder because Gray and Pole were "together when [Mrs. Messenger] got murdered." In its closing argument, the State asserted that Gray's "role" in the crime "was to keep watch" while Pole committed the murder.

## ANALYSIS

¶33. "This Court reviews de novo a trial court's ruling on the legal sufficiency of the evidence." *Buchanan v. State*, No. 2017-CT-01082-SCT, 2021 WL 1310276, at *8 (¶49) (Miss. Apr. 8, 2021) (quoting *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018)). "When reviewing a case for sufficiency of the evidence, 'all credible evidence that is consistent with guilt must be accepted as true, and the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence.'" *Id.* (brackets

---

[4] Pole later filed a motion to sever their cases, which the trial court granted.

[5] Gray's case went to trial first.

omitted) (quoting *Haynes*, 250 So. 3d at 1244 (¶6)).[6] "We examine the evidence in the light most favorable to the State, while keeping in mind the beyond-a-reasonable-doubt burden of proof standard." *Buchanan*, 2021 WL 1310276, at *8 (¶49) (quoting *Haynes*, 250 So. 3d at 1244 (¶6)). "This burden must be satisfied with evidence, not speculation or conjecture." *Id.* (citing *Edwards v. State*, 469 So. 2d 68, 69-70 (Miss. 1985); *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974)). We will reverse and render if "the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty[.]'" *Id.* (ellipsis omitted) (quoting *Haynes*, 250 So. 3d at 1244 (¶6)). However, we will affirm the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Haynes*, 250 So. 3d at 1244 (¶6) (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

¶34. In this case, the State does not argue that Gray actually murdered Myrtle Messenger but rather that he aided and abetted the actual murderer, Pole. "One who aids and abets another in the commission of a crime is guilty as a principal." *Buchanan*, 2021 WL 1310276, at *9 (¶51) (quoting *Hughes v. State*, 983 So. 2d 270, 276 (¶14) (Miss. 2008)). "To aid and abet the commission of a felony, one must do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime or participate in the design of the felony." *Id.* (quotation marks, ellipsis, and brackets omitted) (quoting *Hughes*, 983 So. 2d

---

[6] In addition, because this was a circumstantial evidence case, "the State had the burden to prove [Gray's] guilt not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence." *Johnson v. State*, 224 So. 3d 66, 68 (¶5) (Miss. 2016) (quotation marks omitted).

at 276 (¶14)). "We do 'not recognize guilt by association.'" *Id.* (quoting *Hughes*, 983 So. 2d at 276 (¶14)). "Mere presence, even with the intent of assisting in the crime, is insufficient unless the intention to assist was in some way communicated to the principal." *Hughes*, 983 So. 2d at 276 (¶14) (quotation marks and brackets omitted). Likewise, mere presence "at the commission of a crime without taking any steps to prevent it does not alone indicate such participation or combination in the wrong done as to show criminal liability." *Id.* (quoting *Harper v. State*, 83 Miss. 402, 415, 35 So. 572, 573 (1903)). This is true even if the defendant actually "approve[d] of the [criminal] act." *Id.* (quoting *Harper*, 83 Miss. at 415, 35 So. at 573).

¶35.    Viewed in the light most favorable to the State, the evidence in this case shows, at most, that Gray was aware of the prior altercation between Pole and Scoop and perhaps also the earlier argument between Pole and Michael Messenger; that Gray walked down Poplar Street with Pole but did not go with him to the door of the Messengers' house; that Gray and Pole were carrying guns;[7] that Gray and Pole fled after the shooting and discarded their guns in the same location; and that Gray and Pole were later seen together in a car on Highway 61 north of Clarksdale. Such evidence does not establish beyond a reasonable doubt that Gray actually encouraged, assisted in, or helped to plan the shooting. In particular, there is no evidence to support the State's assertion that Gray acted as a lookout for Pole.

¶36.    In addition, although King's disputed testimony that she saw Gray driving Pole later

---

[7] It was not unusual for Gray or Pole to carry guns. Gray told the detectives that he had borrowed a gun from Cedric Dukes only because someone else had his usual gun. He also told the detectives that he had "seen [Pole] with plenty of guns."

that night might have supported charging Gray as an accessory *after* the fact,[8] Gray was not charged as an accessory after the fact. He was indicted and tried only as a principal/aider and abettor. *See Hall v. State*, 127 So. 3d 202, 204 (¶7) (Miss. 2013) ("[A]ccessory after the fact is a distinct crime for which a person cannot be punished unless indicted." (quotation marks omitted)). Evidence of such after-the-fact assistance does not prove that Gray provided encouragement or assistance prior to or during the crime. *Cf. Gangl v. State*, 612 So. 2d 333, 337 (Miss. 1992) (holding that evidence that would have "support[ed] a conviction of accessory after the fact" was insufficient to support the defendant's conviction as a principal).

¶37. Gray's conduct following the shooting is certainly suspicious, but a conviction may not be based on suspicion alone. "Mere suspicion, no matter how well grounded, is an insufficient basis upon which to base a criminal conviction." *Oswalt v. State*, 885 So. 2d 720, 723 (¶14) (Miss. Ct. App. 2004).[9] Because there was insufficient evidence to prove beyond a reasonable doubt that Gray encouraged, assisted, or otherwise planned or participated in the shooting, I respectfully dissent.

---

[8] *See* Miss. Code Ann. § 97-1-5 (Rev. 2020); *Harris v. State*, 290 So. 2d 924, 925-26 (Miss. 1974).

[9] *See also, e.g., McRee v. State*, 732 So. 2d 246, 249 (Miss. 1999) (stating that evidence that "could justify no more than suspicion" was insufficient because "a conviction must be based on more than mere suspicion"); *Gangl*, 612 So. 2d at 337 (holding that although the defendant's "actions after the commission of the crime [were] certainly suspicious" and would have "support[ed] a conviction for accessory after the fact," they were insufficient to support his conviction as a principal); *Lewis v. State*, 573 So. 2d 719, 723-24 (Miss. 1990) (holding that the defendant's conduct after the crime was enough to "cast[] strong suspicion upon him" but still insufficient to convict him as a principal).