# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00859-SCT

*HOLLY ANN MITCHELL a/k/a HOLLY MITCHELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2023 |
| TRIAL JUDGE: | HON. CLAIBORNE McDONALD |
| TRIAL COURT ATTORNEYS: | JOSEPH LEONARD TURNEY |
| | SHIRLEE MARIE FAGER BALDWIN |
| | BEAU A. STEWART |
| | CARPENTER STEVENS MARSALIS |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/05/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Holly Mitchell was found guilty by a Marion County jury of second-degree murder (Count I) and possession of methamphetamine (Count II). Mitchell appeals her second-degree murder conviction, claiming that the jury was not adequately instructed and that her trial counsel was constitutionally ineffective. Finding no reversible error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2.     In the late afternoon on January 4, 2019, Holly shot and killed her husband, Shawn "Chunk" Mitchell, with a .357 revolver.  The couple was inside their home, and Holly was holding the couple's three-year-old daughter MM[1] when she shot Chunk.  No one else was present in the home.

¶3.     When local officers arrived on the scene, Holly was sitting at the edge of her lawn holding MM in her lap.  The officers found Chunk inside the house lying under the Christmas tree in the living room with a gunshot wound to the head.  Chunk was still gasping for air. He was transported to the hospital where he was pronounced dead.

¶4.     Officer Ryan Williams with the Columbia Police Department testified that when he arrived at the scene, Holly was very frantic and very hostile.  He said Holly stated that she shot Chunk because he had hit her in the face.  Officer Williams also remembered hearing MM say that "Mommy shot daddy."

¶5.     Officer Nate Cook also saw Holly sitting outside with MM when he arrived at the scene.  He testified that Holly said to him, "I had to do it.  I had to do it.  I shot him.  I had to do it."  Officer Cook heard Holly say to another officer that "they had been doing meth the previous night and that morning of that day."

¶6.     Investigator Rita Pickering testified that when she arrived, Holly complained about her head and ear hurting.  She had Holly transported to the hospital to have blood drawn because Holly had admitted using meth.

---

[1] Initials are used in place of the child's name.

¶7.     Holly told Investigator Pickering that the gun she used was in her purse inside her car. There, Investigator Pickering found the .357 magnum used to shoot Chunk.

¶8.     While at the hospital, Investigator Pickering heard Holly say that she was afraid for her child when she shot Chunk. Holly said that Chunk had come into the house in a rage and was trying to take MM and leave. According to Investigator Pickering, Holly kept insisting that she was protecting her child.

¶9.     Officer Jason Cook testified that Holly was hysterical and crying when he arrived at the scene. He transported Holly to the hospital for the blood test. He said that Holly was complaining about pain in one of her ears. While at the hospital, Holly stated to him that she and her husband had used meth earlier that day and that they had been fighting.

¶10.    According to Officer Cook, Holly was making statements that Chunk was not himself. "He wasn't acting human." She said he was acting "like a robot" and "jumping all over the place." She stated that she shot Chunk because she was afraid that he was going to take MM. Phillip Reed testified that the night before the shooting, he, Holly, and Chunk had stayed up all night doing meth. In the morning, Reed and Chunk went to Reed's house to hang out for a while before running errands. They picked up Reed's friend Cheyenne Stevens and returned to Reed's house. They were planning to "sight a .22 magnum" so Chunk went home to get some bullets. When Chunk did not return, Reed and Stevens walked to Chunk and Holly's house to check on him.

¶11.    Chunk met Reed at the front door. Chunk told Reed that the bullets were in his truck. Reed said that Chunk and Holly were arguing at the time, and Reed asked Chunk to leave

3

with him so the argument would stop. Chunk replied that he would be at Reed's house in five minutes. Reed and Cheyenne went back to Reed's.

¶12.    Meanwhile, across the street from Holly and Chunk's house, neighbors were having a family gathering. Harry Jones testified that he and others were sitting on the porch at his in-laws' house. Jones heard "arguing going on" across the street inside the house. As it continued, he saw a woman come outside of the house, reach into a white vehicle, and then walk back into the house. Jones said that about five to ten minutes later, he heard a gunshot. Jones then called 911. Afterwards, Jones said the woman came back outside and got "in the car." He said that she sat in the car for a minute and then got back out. His stepson Tyson Johnson then went to talk to the woman.

¶13.    Johnson testified that he was sitting on his in-laws' porch when he saw a woman across the street come outside of the house and go to a vehicle, reach for something in the front seat, and then go back inside the house. He did not see what it was that the woman reached for inside the vehicle. He said that after she went back inside the house, they heard a gunshot about five minutes later. Afterwards, the woman came out of the house and began "walking around in the front yard." Johnson asked her, "Is everything all right?" The woman then started walking toward them, and Johnson met her half way in the street. She said, "He need help. He need help." She asked Johnson, "Could you go check on him, go check on him." Johnson told her no and said, "we'll call the police." Johnson said the woman then went back inside the house and came out with the little girl.

4

¶14. Jones's cousin Miguel Cook testified that he arrived at the family gathering before Jones and Johnson. He saw a man and woman standing outside across the street. Cook "heard a little arguing going on," but he ignored it. He said the man was holding a child. He did not hear the man yelling or cussing, and the man did not seem angry. He said the woman was angry and was using an "outside voice." After the man and woman went inside the house, Cook saw the woman come back outside, walk to a vehicle, reach inside the vehicle, then walk inside the house. Cook said he heard a gunshot seconds later.

¶15. MM, who was eight years of age at the time of trial, testified on behalf of the State. MM said she heard her parents "talking mean" at each other on the day of the shooting. According to MM, she (MM) and Chunk then left the house and drove to the police station, but it was closed, so they went back home. Back at the house, MM recalled that she was being held by Holly on her hip while Holly and Chunk were "fussing" in the living room. MM said Holly was pointing a gun at Chunk. MM said she did not see Chunk push, hurt, or hit Holly. She said that Chunk was standing in front of them at the time, not close, but a "little further away." He did not have anything in his hands, and he was not coming toward her and Holly when Holly shot him.

¶16. A number of other witnesses testified for the State as to Holly and Chunk's seven-year marriage. It was described as happy in the beginning, but it became chaotic after they both started using meth in 2013.

¶17. Ryan Tolar, a friend of both Holly and Chunk, testified that the couple began arguing more frequently in the summer of 2018. Tolar, who was living in the couple's home at the

time, told the jury about an incident that occurred in July 2018. Holly and Chunk were arguing in their bedroom. Reed, another mutual friend of the couple and Tolar, came out of their bedroom holding MM and handed her to Tolar. Tolar took MM out of the house and handed her to another friend who was standing outside.

¶18. When Tolar went back inside, he saw Chunk and Reed trying to pry a revolver from Holly's hand. Tolar identified the revolver that Holly had used to shoot Chunk as the same revolver that Holly had in her hand when she and Chunk were arguing.

¶19. Tolar also testified about an incident that occurred in September 2018. Tolar said that he and Chunk had to take the same revolver away from Holly when she was threatening Chunk with it. Tolar recalled how hard it was to pry it out of Holly's hand. When asked what Chunk would say when Holly threatened him with the gun, Tolar said Chunk said the same thing the last time Holly threatened him: "if you're going to shoot me, b****, shoot me."

¶20. Reed testified that the argument between Holly and Chunk during the July 2018 incident began because Chunk had taken Holly's car earlier that day to drive to New Orleans to "pick[] up Xanax and a dog." The argument escalated into a physical altercation between the two in the bathroom adjoining their bedroom. Reed said that when he entered their bedroom to break up the fight, Holly was on Chunk's back while Chunk was holding MM. Reed said that Holly had her hand in Chunk's mouth. Reed took MM outside of the bedroom and handed her to Tolar. When Reed went back into the bedroom, he saw Holly pointing a gun at Chunk while the two were standing at the foot of their bed.

6

¶21.   Reed walked up behind Holly and grabbed her and the gun, and the two fell onto the bed.  Both Reed and Chunk then took the gun away from Holly.  Reed identified the gun used to shoot Chunk as the one Holly was holding during the July 2018 incident.

¶22.   A number of witnesses testified on Holly's behalf, including Holly.  Holly's sister Heidi Holloway testified that Holly and Chunk had a good relationship before they got married.  Afterwards, Holly became more distant from Heidi because of Chunk.  She said Holly would send her photographs of bruises on her body several times from arguments with Chunk.

¶23.   Martin Weathers, Heidi's boyfriend, testified about an incident that occurred on at an Easter gathering that he and Heidi were having at their house.  Holly and Chunk were there earlier in the day, but they left.  Chunk returned later looking for Holly and began cussing at everyone because they did not know where Holly was.  Chunk then left in his truck, peeled out of the driveway, and fishtailed in the road, almost hitting a lamp pole.

¶24.   Holly's daughter from another relationship, who was seventeen at the time of trial, testified that Holly and Chunk's marriage was very toxic.  It was both verbally and physically abusive.  She said the "majority of abuse and all abuse instigations were from [Chunk]."  She then told of incident when she was sitting at the dinner table with Holly and Chunk.  Holly and Chunk began arguing, and Chunk grabbed a fork and stabbed Holly in the hand.

¶25.   Scarlett Parker, Holly's mother, testified that Holly and Chunk had a lot of happy times.  But some abuse started after MM was born in 2015.  Parker said there were many times that Holly would call her to come get her.  Parker said that in July or August 2018, she

went to Holly and Chunk's house unexpectedly, and she heard yelling inside. Parker went inside and found Holly sitting on the edge of the bed with her head down while holding MM. Chunk was standing over them screaming and yelling. She said the couple had just gotten MM back "through the court system." Parker said she noticed guns lying on the floor around them.

¶26. She said Chunk would stop yelling at Holly and then sit on the floor and start loading the guns. He would then get back up and walk over to Holly and start screaming and yelling again. Then Chunk would go back to loading his guns. She said Chunk did this several times, pacing back and forth.

¶27. Parker said she told Holly and Chunk that they needed to stop this for MM's sake. According to Parker, Chunk then calmed down, "just like a light switch." He walked over to Holly and MM and started hugging them, crying, and apologizing.

¶28. Parker said she then left and took MM with her. She called Chunk's mom to let her know what was going on. She said that a couple of hours later, Holly and Chunk came to pick up MM from her house. She said Holly and Chunk were loving to one another, and it was like it never happened.

¶29. Parker testified about other incidents prior to 2018, when Holly would have to take MM and leave the house because of the way Chunk was acting. She said Chunk would not allow Holly to have a relationship with her family. She said that when Holly would get a job, Holly would eventually have to quit because Chunk would not allow her to work outside of the house.

¶30.   Evidence was presented that Chunk was arrested in 2016 at his place of employment for domestic violence after Holly filed charges against him.  Holly had claimed that Chunk had choked her.  Andrew Reid, the police officer who took a statement from Holly when she filed charges, said he observed Holly and noticed bruising on her upper left arm and a swollen right cheek and eyebrow.  Reid said that officers had determined that Holly was in imminent danger when she filed charges so they went to Chunk's place of employment and arrested him.

¶31.   Evidence also was presented that the 2016 matter went before the grand jury, which issued a no true bill for lack of probable cause to charge Chunk with domestic abuse.

¶32.   Holly testified that on the day of the shooting, Chunk left the house early that morning to hang out with Reed.  Chunk came back around 3:00 in the afternoon "enraged, irate, furious," looking for his drugs.  Holly said that she knew he had found the drugs because when she walked downstairs into their bedroom, Chunk was calm and holding MM.  She saw him "open[] the bag and consume[] a huge piece."  Holly started crying and begged Chunk to stop, but he ate it anyway.

¶33.   Afterwards, Chunk walked toward Holly and "kind of push[ed]" her.  She said they were standing in the bathroom at the time, and she started backing out.  MM saw that Holly was crying and started reaching for Holly.  Holly said she was trying to get MM out of Chunk's arms because Chunk "always did drugs, but he didn't usually do it in front of her."  She said that is when Chunk hit her (Holly) on the head.

¶34.    Holly said there was an "AR-15" propped up against the wall in the bedroom.  Chunk looked over at it, "like he was going to reach to grab it."  Holly said she was closer to the rifle so she grabbed it, ran out of the bedroom, and threw it on the couch to get it out of Chunk's reach.

¶35.    Holly said she started going back to the bedroom when she saw her purse sitting on the bar near the living room.  She grabbed the purse and went downstairs into the bedroom.  She was still attempting to get MM from Chunk because MM was screaming "mama."  Holly grabbed MM and went out of the bedroom toward the living room.  She said, "the whole time [Chunk's] like, I'm going to get her.  And he's coming at me."

¶36.    Holly said that when they were all in the living room, Chunk reached into her purse for her gun.  Holly also reached into her purse to try and stop Chunk.  "The gun comes out.  He pushes my way.  I push his way, just as a reflex to push the gun away from us, because I'm holding my baby, and it goes off.  It hit him."

¶37.    Holly was still holding MM, and they go out the front door because "we were trying to leave to begin with.  I was going to go to my grandmother's with her.  I was just still trying to leave."  She said she opened the back driver's side of the car.  "I sat [MM] on the back seat.  I placed my gun - - I mean, not the gun, the purse and the gun on the floorboard."

¶38.    Holly realized that Chunk still had her keys from that morning.  And he had placed them on the bathroom counter.  She ran inside and grabbed her keys.  She came back outside and noticed there was no car seat.  She then grabbed MM and saw her neighbors across the street and that is when she asked them to call the police.

10

## Jury Deliberation

¶39. After the close of evidence, the jury was instructed on second-degree murder, heat-of-passion manslaughter, and accidental shooting. The jury also was provided a form-of-the-verdict instruction, Jury Instruction 18.

¶40. It read:

> The Court instructs the jury that if you find from the evidence in this case, beyond a reasonable doubt, that the Defendant, HOLLY ANN MITCHELL, is guilty of Second-Degree Murder, then the form of your verdict should be as follows:
>
>> We, the jury, find HOLLY ANN MITCHELL guilty of Second-Degree Murder as to Count One."
>
> If you find from the evidence in this case, that the Defendant, HOLLY ANN MITCHELL, is not guilty of Second-Degree Murder, but do find HOLLY ANN MITCHELL guilty of Manslaughter of Shawn P. Mitchell beyond a reasonable doubt, then the form of your verdict should be as follows:
>
>> We, the jury, find HOLLY ANN MITCHELL guilty of the lesser-included offense of Manslaughter."
>
> If you find from the evidence in this case, that the Defendant, HOLLY ANN MITCHELL, is not guilty of Second Degree Murder or the lesser-included crime of Manslaughter, then the form of your verdict should be as follows:
>
>> "We, the jury, find HOLLY ANN MITCHELL, not guilty as to Count One.

¶41. The jury sent out a number of notes to the trial court during deliberations, which lasted approximately six and a half hours.

**First Note**

11

¶42.    The first note read: "The jury is undecided on 2nd degree murder vs. manslaughter. Does everyone have to agree to both?  I don't see how someone could say guilty to 2nd degree but not guilty to the lesser crime."

¶43.    The trial court told the jury:

> You have a jury instruction and that jury instruction says that, first, you're to ask yourself, is it second-degree murder.  Then, you vote on that.  If all 12 vote that it is second-degree murder, that's the verdict.  Then, you go onto the narcotics count.

> If you vote not guilty on the second-degree murder, then you go to the manslaughter and you vote on the manslaughter to determine . . . whether or not there's guilty on manslaughter.

> And then you go to the - - then Count II is a separate count that you can vote on.

> So you can vote on the murder and manslaughter separately.  And you can vote on the narcotics charge separately.

> Everybody understand?

Both the State and the defense were in agreement with the trial court's response.  One juror indicated that she still had a question; the jury, however, was sent back to deliberate.

**Second Note**

¶44.    Shortly thereafter, the trial court reconsidered the jury's question.  Upon further discussion with counsel for both parties, the trial court sent the court clerk into the jury room to pull out for the jury the form-of-the-verdict jury instruction and also the elements instructions on second-degree murder and manslaughter so that the jury could compare them. According to the trial court, those particular instructions "would pretty much answer the question that the jury had when they came out."

12

¶45. A few hours later, the jury sent out a note asking, "What happens if the jury cannot agree on the guilty verdict as 2nd degree or manslaughter? (unanimously)." In response to this question, the trial court gave the jury a *Sharplin* instruction.[2]

**Third Note**

¶46. Approximately an hour and a half later, the jury sent out another note stating, "Can we please have directions on how to vote and determine a verdict if we cannot get a unanimous agreement on second degree murder? What if all 12 will not agree to 2nd degree murder?"

¶47. Initially, the trial court proposed telling the jury that if they could not all agree on second-degree murder, then they have to "drop down and vote on manslaughter." Defense counsel responded, "Your Honor, this needs to be kept simple. Y'all have the instructions. Y'all come to an agreement or you can't." Defense counsel further stated, "They need to figure out where they're at, figure it out for themselves. They have everything."

¶48. Extensive discussions continued between the trial court and both parties on how to handle it. At one point, the trial court stated, "They obviously do not understand the jury instructions . . . given to them. I don't know. Do y'all want a hung jury on a case? Is that what y'all want?" Both sides responded as follows:

> **Defense Counsel**: Other than, Your Honor, that they do have three options. The two you've already mentioned that's in the instructions. If you cannot come to an agreement on either one, then your announcement is you're a hung

---

[2] *See **Sharplin v. State***, 330 So. 2d 591, 596 (Miss. 1976) (in which this Court authorized a particular jury instruction the trial court may provide when "confronted by a hung jury").

13

jury for second-degree murder, if you can't agree to manslaughter and if you can't agree to hung jury.

**The Court**: All right. Are y'all in agreement with that? In other words, I tell them that? In other words, I tell them that they go first - - I mean, second-degree manslaughter and - - excuse me, second-degree murder, manslaughter, and - -

**The State**: Well, Judge, they only go down to manslaughter if the State hasn't proven second-degree murder. Not if they - - if they can't agree - -

**The Court**: Obviously somebody doesn't think they have.

**The State**: I understand that, Judge. But apparently others think we have.

What I'm saying is - -

**The Court**: You want to hang it up?

**The State**: They can't abandon the charge. Well, Judge, I don't want to, but I don't know that we're left with any other choice. They cannot abandon the charge indicted and to a lesser included unless they determine that we did not meet our evidence.

**The Court**: Well, I'm going to tell them that.

**The State**: Yes, sir.

**The Court**: I mean, it's in the jury instruction. As to these other questions, I mean, good God almighty.

**The State**: The safe bet is, you've received the instructions of the Court, please continue your deliberations.

**Defense Counsel**: Your Honor, I see no - - they come to unanimous agreement, which required for [sic] in any case - -

**The State**: You have to take - -

**Defense Counsel**: And then they have, then they have the opportunity to announce that that is - - they are not possibly coming to agreement and, therefore, are a hung jury.

14

¶49.   The trial court again proposed telling the jury that if they "cannot not reach a unanimous verdict on that charge, then you're to drop down and consider whether or not the defendant is guilty of the crime of manslaughter." Holly's other defense counsel responded, "That appears not to give them any other option other than to find one or the other."

¶50.   Eventually, the trial court had the jury brought out and instructed them as follows:

> Ladies and gentlemen of the jury, one, I am not allowed to talk to you individually about a matter unless it's a health-related matter. So I can't talk to you individually.
>
> Secondly, you have jury instructions, at least two, that indicate to you what the law is on how you approach the procedure available in the case.
>
> In other words, you already have those.
>
> Now, this case, of course, involves as you will see in the jury instructions, it involves Mr. Mitchell and it involves Mrs. Mitchell. And that's what it involves.
>
> I wish I could - - I wish I could instruct you further, but I'm not allowed to do that.
>
> So, at this time, I'm going to send you back in there to continue your deliberations, but the case is about Mr. and Mrs. Mitchell, not the United Nations or anything of that sort.
>
> All right. That's it.

¶51.   The jury reached a verdict approximately one hour later. They found Holly guilty of second-degree murder. The record indicates that the trial court then polled the jury.

¶52.   Holly appeals from her second-degree murder conviction. She claims that she was denied her constitutional right to due process because the jury was not adequately instructed. Holly further claims that her trial counsel was constitutionally ineffective for not submitting

15

additional jury instructions covering imperfect-self-defense and culpable-negligence manslaughter.

## DISCUSSION

### I. Whether Holly's due-process rights were violated given how the jury was instructed.

¶53. Holly argues that the jury instructions were confusing. She contends that the jury did not understand that it was not supposed to consider the lesser-included offense of manslaughter unless it first reached a verdict acquitting Holly of second-degree murder. She submits that the jury's questions to the trial court indicate that the jury considered both offenses from the start, as if they were choosing which of the two offenses they felt Holly should be convicted of rather considering the elements of second-degree murder first. Holly further contends that the jury did not understand that one of the options was that the jury could reach no verdict at all. And the trial court erred by failing to instruct the jury that it could be deadlocked.

¶54. The State contends that Holly waived this issue for appeal. The State argues that not only did Holly fail to object to the trial court's proposed responses to the jury's questions, but she also acquiesced to the responses. The State further contends that procedural bar notwithstanding, the jury instructions were not confusing; rather, "they were crystal clear."

¶55. The State submits that Jury Instruction 12 set forth the elements of second-degree murder and provided that if "the State has proven each of these elements beyond a reasonable doubt, then you shall find Holly Ann Mitchell guilty of Second Degree Murder." Jury Instruction 12 added: "If the State did not prove any one of these elements beyond a

16

reasonable doubt, then you shall find Holly Ann Mitchell not guilty of Second Degree Murder."

¶56. The State argues that Jury Instruction 13 told the jury that if the State failed to prove one or more of the elements of second-degree murder, it should "proceed with [its] deliberations to decide whether the State has proved beyond a reasonable doubt the elements of the lesser crime of manslaughter." Jury Instruction 14 defined heat-of-passion manslaughter.

¶57. Jury Instruction 15 also instructed that if the State did not prove any one of the elements of second-degree murder, "then you are to proceed with your deliberations and decide whether the State has proven all of the elements of the lesser-included crime of Manslaughter beyond a reasonable doubt." Jury Instruction 15 provided the elements of manslaughter in this case and further instructed that if the State "has proven these elements beyond a reasonable doubt, then you must find the Defendant guilty of the lesser-included crime of Manslaughter as to Count One." Jury Instruction 15 added: "If the State has failed to prove any one or more of the elements of the lesser-included crime of Manslaughter beyond a reasonable doubt, then you shall find the Defendant not Guilty as to Count One."

¶58. There is no question that the jury was confused on how to deliberate with regard to second-degree murder and manslaughter. We point out that Jury Instruction 15, submitted by the State, initially contained the following language:

> [I]t is your duty to accept the law as given to you by the Court. If the facts and the law warrant a conviction of the crime of second-degree murder, then it is your duty to make such finding without considering your power to find a lesser crime. The power of the jury to find the State has proved the lesser crime of

17

manslaughter is not designed to relieve you from the performance of an unpleasant duty.

¶59. Defense counsel objected to it because it "seems very loaded, confusing." The State contended that the purpose of this language "is to avoid a compromised verdict, which would be improper." The trial court stated that its "original thought was it helped protect the defendant, but if the defendant doesn't want it, then I'll cut out that second paragraph." Accordingly, Jury Instruction 15 was submitted without that language.

¶60. In *Walker v. State*, 671 So. 2d 581, 607 (Miss. 1995), this Court found no error with a jury instruction that used this same language. *Walker* rejected the notion that this was an "acquit-first type instruction," the effect of which was to coerce jurors who believed the defendant guilty of a lesser charge into convicting the defendant of the greater offense. *Id.* (internal quotation marks omitted).

¶61. We think that had Jury Instruction 15 been submitted as originally written, it may have thwarted the jury's confusion in this case.

¶62. Nevertheless, as the State points out, a "trial court has authority to give supplemental instructions to a jury and the decision to do so is reviewed under an abuse-of-discretion standard." *Hughes v. State*, 983 So. 2d 270, 280 (Miss. 2008) (citing *Mickell v. State*, 735 So. 2d 1031, 1033 (Miss. 1999)). Here, the trial court initially proposed telling the jury that if it could not reach a unanimous verdict on second-degree murder, then they should "drop down and consider whether or not the defendant is guilty of the crime of manslaughter."

¶63. But defense counsel disapproved of the trial court's proposal. We point out that in *Isom v. State*, 481 So. 2d 820, 821 (Miss. 1985), this Court reversed a manslaughter

18

conviction when the trial court sent the jury a special interrogatory instruction, which read in part:

> Do you unanimously agree that the defendant is guilty of either murder or manslaughter according to the instructions given and that the killing of Frankie Shaw was not in necessary self-defense according to the instructions? If your answer is "yes," then you are authorized to return a verdict of guilty of manslaughter.

¶64. This Court concluded that "the trial court's action after receipt of the verdict that the jury was deadlocked forced a verdict of guilty of manslaughter by suggestive or coercive measures." *Id.* at 823-24.

¶65. Given that Holly's defense at trial was that this was an accidental shooting, defense counsel may have been concerned that the trial court's proposed instruction would have negated their defense.

¶66. Nevertheless, "[i]n determining whether error lies in the granting or refusal various instructions, the instructions actually given must be read as a whole." *Payton v. State*, 897 So. 2d 921, 956 (Miss. 2003) (citing *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997), *overruled on other grounds by Dilworth v. State*, 909 So. 2d 731, 735 n.4 (2005)). "If the instructions, when so read, fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* (citing *Coleman*, 697 So. 2d at 782). This Court presumes that the jury follows the instructions of the trial court. *Id.* (citing *McCollum v. State*, 785 So. 2d 279, 283-84 (Miss. 2001)).

¶67. Here, the jury instructions properly informed the jury as to the elements of second-degree murder and manslaughter. The instructions properly informed the jury as to how to proceed in deliberations. And the jury ultimately came to a unanimous decision.

¶68. Accordingly, we find no merit to this issue.

## II. Ineffective Assistance of Counsel

¶69. Holly contends that even though evidence supported both imperfect-self-defense manslaughter or culpable-negligence manslaughter, her trial counsel failed to submit an instruction for either theory.

¶70. The State contends that this Court should not address Holly's ineffectiveness claim on direct appeal because the record is not as fully developed as it would be in a post-conviction proceeding. The State contends that if this Court finds otherwise, the claim is without merit because trial counsel's decision not to request an instruction for either of these manslaughter theories constitutes trial strategy.

¶71. We agree that this was trial strategy given that Holly proceeded at trial on the claim that the shooting was an accident. But we also find that it would be best to dismiss this issue without prejudice to allow Holly to raise it in a post-conviction proceeding if she chooses.

¶72. This Court typically only addresses the merits of an ineffective-assistance-of-counsel claim on direct appeal when (1) "the record affirmatively shows ineffectiveness of constitutional dimensions," or (2) "the parties stipulate that the record is adequate" to allow the appellate court to make the finding without consideration of the findings of fact of the

trial judge. *Ross v. State*, 288 So. 3d 317, 324 (Miss. 2020) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (Miss. 2016)). Neither of these requisites is present.

¶73. According to the record, some discussion occurred during the jury-instruction conference in which the trial court suggested adding an imperfect-self-defense instruction. The State contended that there was no evidence to support such an instruction based on Holly's testimony at trial. Defense counsel argued, however, that evidence supported such an instruction. The trial court suggested that they revisit the matter after going over the defense's proposed jury instructions, none of which provided for imperfect-self-defense manslaughter or culpable-negligence manslaughter. They never did revisit the matter.

¶74. We find that the record is not as developed as it would be in a post-conviction proceeding. Therefore, we dismiss Holly's ineffective-assistance-of-counsel claims without prejudice to allow Holly to raise them in a post-conviction proceeding if Holly so chooses.

**CONCLUSION**

¶75. Holly's conviction for second-degree murder is affirmed.

¶76. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. ISHEE, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY RANDOLPH, C.J., AND BEAM, J.**

**ISHEE, JUSTICE, CONCURRING:**

¶77. I agree with the majority that the jury instructions were adequate. But I write separately to emphasize best practice for trial courts in circumstances such as these.

21

¶78.	In its three notes to the trial court, the jury expressed confusion regarding the deliberation process. The jury's confusion ultimately stemmed from its not understanding whether the jury instructions required it to unanimously acquit Holly of second-degree murder prior to considering manslaughter or whether it could instead consider manslaughter while being split on second-degree murder.

¶79.	Despite the jury's expressing its confusion three separate times, the trial court endeavored to clarify the deliberation process for the jury only once—when it responded to the first note. To be sure, the **Sharplin** instruction[3] in response to note two and the court's silence in response to note three shed no light on how the jury was to treat the two offenses.

¶80.	Concerning to me is the trial court's failure to cure the jury's confusion following the third note. Once the jury sent out the note, that the jury simply did not understand the instructions was readily apparent. And at that point, the jury was openly in need of the trial court's clarification of the deliberation process. While trial courts should certainly exercise caution when commenting on jury instructions, I stress that not all commentary is unduly influential or coercive. No harm would have resulted had the trial court clarified the deliberation process for the jury in this case. Armed with a clearer procedure, the jury would have been better equipped to discharge its duty.

¶81.	I certainly am not assigning trial courts a duty to issue supplemental instructions. I am, however, urging trial courts to take the opportunity to clarify the deliberation process for the jury in cases in which the jury is so blatantly confused, as it was here. The standard

---

[3] *See* **Sharplin v. State**, 330 So. 2d 591 (Miss. 1976).

22

should not be for trial courts to remain silent when a jury requests guidance on how to deliberate. *See generally **Isom v. State***, 481 So. 2d 820, 824 (Miss. 1985) (Robertson, J., concurring) (criticizing that this Court had "in effect told the trial judges of this state that once the jury retires they should become mutes"). The standard should instead be for trial courts to make the deliberation process as clear as possible for the jury. The best practice for trial courts is to, without being unduly influential or coercive, provide the jury with the information necessary to render an honest, accurate verdict under the law rather than leave the jury to wander through the dark.

**RANDOLPH, C.J., AND BEAM, J., JOIN THIS OPINION IN PART.**